MELVIN SATRUM AND THORDIS SATRUM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5079–72. Filed June 27, 1974.

*Charles L. Johnson,* for the petitioners.
*Joseph M. Wetzel,* for the respondent.

STERRETT, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1967 | $7, 240 |
| 1968 | 14, 698 |
| 1969 | 48, 990 |

The parties have made certain concessions leaving for adjudication the issue of whether certain structures, known as egg-producing facilities, were "building[s]" within the meaning of section 48(a)(1)(B), I.R.C. 1954,[1] thereby making petitioners' investment in such structures ineligible for the investment credit provided by section 38.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with. attached exhibits, are incorporated herein by this reference.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Petitioners Melvin Satrum and Thordis Satrum are husband and wife, and resided at Woodburn, Oreg., at the time of the filing of their petition herein. The petitioners filed joint Federal income tax returns for the calendar years 1967, 1968, and 1969 with the Internal Revenue Service Western Service Center at Ogden, Utah. At all relevant times the petitioners used the cash basis method of accounting. We will hereinafter refer to Melvin Satrum as "petitioner."

During the years at issue petitioner was a farmer engaged principally in the business of producing eggs for sale. His egg business was conducted as a sole proprietorship known as "Valley View Egg Farm." The petitioner expended the following amounts in the construction and remodeling of walls, concrete slab base, and roof of the egg-producing facilities used in this business:

| Year | Amount |
| --- | --- |
| 1967 | $21, 009 |
| 1968 | 3, 500 |
| 1969 | 49, 284 |

These expenditures do not relate to the costs or installation of equipment or machinery used in the egg-producing facilities. The petitioners claimed an investment credit in respect of the expenditures above under the provisions of section 38.

Each egg-producing facility is a rectangular structure, 240 feet long and 51 feet wide. The height ranges from some 8 feet where the side walls are in contact with the roof to in excess of 14 feet at the roof's uppermost point or peak. The outer walls are constructed of corrugated metal, resembling a quonset hut. The walls actually consist of three separate partial walls, containing louvers, designed specifically to control ventilation.

The floors are made of concrete slab with a thickness of 2 inches. The floor slopes approximately ½ inch for every 8 feet in length and is designed to provide a continuous water flow for the chickens.

The roof supports 13 air coolers controlled by thermostats which provide forced air throughout the structure. The roof, because of the weight, is supported by braces 8 feet apart throughout the structure.

Each facility houses 20,000 chickens in double-decked cages. The roof braces help support the cages and the cages are separated by aisles. At the end of each structure is a small area where eggs may be stacked prior to placement in cooler rooms. Running next to the cages are troughs for feed and water. The cages themselves are sloped, thereby causing eggs which have been freshly laid to roll forward onto trays from which they are collected.

During the years at issue the petitioner employed seven individuals. The normal duties carried on inside the egg-producing facilities were threefold: (1) Egg gathering from trays below the cages, a chore carried out by two employees and requiring between 2 and 2½ hours to complete; (2) feeding of chickens, requiring one employee on an electric feeder 40 minutes; (3) removal of chicken droppings, requiring 30 minutes and one employee with a forklift-type machine which scrapes dropping boards below the cages. During these operations employees will check for dead chickens and remove them.

Every 20 to 24 months the chickens will no longer lay eggs profitably and must be removed. Petitioner will hire 14 to 16 youths, who carry the chickens out of the structure and load them on trucks to be sold later. It takes approximately 5 hours to carry out the chickens from one structure. Twenty thousand (20,000) new chickens are brought in during 1 day, requiring approximately 10 hours.

### OPINION

We have been called upon to determine whether petitioner's investment in the walls, roof, and floors of an egg-producing facility qualify for the credit provided in section 38.[2] Among the requirements necessary to qualify for the credit, and the only requirement at issue with the parties, is that the property for which the credit is sought must be "section 38 property," as defined by section 48, which states in part:

SEC. 48. (a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction * * *, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), * * *

In the instant case the respondent has concluded that the facility's outer structure was "a building." Petitioner contends that the structure was "other tangible property" used as an integral part of production.

---

[2] SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

Under the broad authority granted him by section 38(b), respondent has defined the term "building" as follows:

Sec. 1.48–1(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include * * * (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

While the legislative history of the investment credit indicates that "building" is to be given its commonly accepted meaning (H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 516; S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 858–859), it is clear that the courts have concluded that certain structures, though outwardly resembling buildings, were not considered so for purposes of section 48(a)(1)(B). *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973) (tobacco sheds), affirmed per curiam 491 F. 2d 1258 (C.A. 6, 1974); *Robert E. Catron*, 50 T.C. 306 (1968) (refrigerated portion of corrugated metal quonset hut).[3] The respondent, too, has reached a similar conclusion with respect to certain structures: Rev. Rul. 72–223, 1972–1 C.B. 17 (hydroelectric powerplant); Rev. Rul. 71–489, 1971–2 C.B. 64 (permanent refrigeration facility); Rev. Rul. 69–557, 1969–2 C.B. 3 (tile and concrete dry kiln); Rev. Rul. 68–132, 1968–1 C.B. 14 (one-story, steel-clad potato-processing chamber). The courts have generally applied a "function" or "use" test to determine whether a structure was a building or other tangible property. *Central Citrus Co.*, 58 T.C. 365 (1972); *Robert E. Catron, supra* at 310–311.

In the instant case there is little doubt in our mind that the structure was specially designed as an integral part of the egg-producing process. The sides of the structure did not have a normal wall, but rather had three louvered wall sections to enable proper control of ventilation. Closely spaced beams, which supported the roof and numerous coolers

---

[3] See also *Adolph Coors Co.*, T.C. Memo. 1968–256 (27 T.C.M. 1351 (1968)) (beer cellars).

located on the roof, were also necessary supports for the cages where the chickens were housed. Further the concrete floor sloped to provide a continuous water flow. Because of the sheet metal construction, the closely spaced beams, and the sloping floor, we do not believe that this structure could be economically used for any purpose other than for the specific purpose for which it was designed. Moreover we think it reasonable to expect replacement of the entire facility, if the property housed within were to be abandoned.

In *Sunnyside Nurseries*, 59 T.C. 113 (1972), and *Arne Thirup*, 59 T.C. 122 (1972), though it was clear that the greenhouses in question were specifically designed for the growing of plants, we held that the structures were "buildings" in part because the structures provided "working space where a substantial number of persons were frequently and regularly occupied." *Sunnyside Nurseries, supra* at 122. Petitioner's facilities contained space between the cages where human beings could walk, and various individuals did conduct several chores there such as collection of eggs, feeding, and removal of droppings. The latter two chores were done mechanically using an electric cart. The eggs were stacked in a small open area at one end of the structure and were then removed to a storage chamber. If one person were to do all the above-mentioned tasks, it would require approximately 6 hours per day.

Though it is difficult to draw the line between providing no working space and providing such a quantum of space for workers that the structure becomes a "building," we believe that the work done within petitioner's facilities can be analogized to the maintenance and collection of goods, a typical activity in any facility that serves merely as a storage area or processing chamber. *Central Citrus Co., supra; Robert E. Catron, supra.* See also *Sunnyside Nurseries, supra* at 121. Specifically here, we would characterize the work performed by humans in the facility as merely supportive of, and ancillary to, the production work performed therein by the chickens which was, to state it in the vernacular, what the facility was all about.

It follows that, based on both the nature and amount of work done within each facility, we are constrained to hold that the egg-producing facilities were not "building[s]" the "purpose of which was to provide working space." See sec. 1.48–1(e) (1), Income Tax Regs.

Rev. Rul. 66–329, 1966–2 C.B. 16, poses a situation which bears a striking resemblance to the instant case. There, an elliptical steel structure housed an integrated hog-raising facility, which had automatic watering and feeding, ventilation, and manure disposal systems. While human activity is not mentioned, we can only assume that there was some maintenance work and human supervision of the hogs. The

respondent determined that the structure was a building and did not qualify for the investment credit.

Thus it is we note with interest the following portion of a subsequently published Senate Finance Committee Report, accompanying the to-be Revenue Act of 1971, which undertook to clarify existing law with respect to the term "building":

> The committee also desires to make it clear that the term "building" is not intended to include a structure which houses property used as an integral part of a manufacturing or production activity (or other activity referred to in sec. 48(a)(1)(B)(i)) if the use of the structure is so closely related to the use of the equipment it houses that the structure clearly can be expected to be replaced when the property it houses is replaced. Factors which would tend to indicate that a structure is closely related to the use of the equipment include the fact as to whether the structure has been specifically designed to provide for the stress and other demands of the equipment which the structure houses and the fact as to whether the structure could not be economically used for other purposes.
>
> One example of a type of structure closely related to the product it houses which was called to the attention of the committee is a unitary system for raising hogs which includes automatic feed systems, special airflow units, slatted flooring, pens and partitions. The structure which can be added to, according to the number of hogs raised, is no more than a cover and way of tying together the specially designed pens, automatic feed systems, etc. There is no other practical use for the structure and it can, therefore, be expected to be used only so long as the equipment it houses is used. Such a structure would be eligible for an investment credit. [S. Rept. No. 92–437, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 575.]

In light of Congress' expressed intentions, and because we believe that each facility is designed to function as one integrated unit, we find that they qualify as "other tangible property" used as "an integral part of production [of eggs] * * *" as contemplated by section 48(a)(1)(B), and therefore do not fall within the nonqualifying category of "building[s]." We therefore hold that petitioner is entitled to a credit for his investment in the structures during the years in issue.

Reviewed by the Court.

*Decision will be entered under Rule 155.*

DAWSON, *J.*, dissenting: Yes, Chicken Little,[1] the sky is falling! The majority of this Court has just declared that the "building" in which you live will no longer be called the "henhouse." Henceforth it will be known as "other tangible property" so that your two-legged, unfeathered friends might reap the benefits of an investment credit. I know it must be as much of a psychological shock to you as it is to me, for my rural heritage always taught me that a "henhouse" is really

---

[1] Classic English folk tale. See the modern version, "Henny Penny" by Paul Galdone, The Seabury Press, New York (1968).

and truly a "building." It has the unmistakable look of a building. It is not unlike "barns," housing cows and horses, which are treated as "buildings" under section 1.48–1(e)(1), Income Tax Regs.

The majority has arrived at its conclusion that petitioners' henhouses were not buildings by discounting the human activity that took place inside the houses. It discounts the activity because of the nature and quantity thereof. The nature of the activity is characterized as "the maintenance and collection of goods, a typical activity in any facility that serves merely as a storage area or processing chamber." The quantity of the activity is described as that which would occupy one person for 6 hours per day.

To my mind the maintenance and collection of goods is comparable to what went on in the greenhouses in *Sunnyside Nurseries*, 59 T.C. 113 (1972), and *Arne Thirup*, 59 T.C. 122 (1972), on appeal (C.A. 9, May 14, 1973). The majority herein does not challenge the correctness of these decisions, but distinguishes them on the ground that there the structures involved provided "working space where a substantial number of persons were frequently and regularly occupied." To be sure, there was less human activity in petitioners' henhouses than took place in the greenhouses, but in my judgment there was sufficient work performed by human beings in the henhouses so as to require the same result. The activity here was conducted on a daily basis, it was indispensable to the operation, and it was substantial. To properly care for the poultry it was necessary for *people* to provide feed, grit, water, temperature and lighting control, egg collecting (14,000 each day), and the removal of droppings and dead chickens. Frankly, I do not see how this degree of human activity can be discounted in the way it has been by the majority. There was as much, and probably more, human activity in these henhouses [2] than there is in any barn, which is plainly a "building" within the meaning of the statute.

It seems to me that the majority has erroneously applied settled law to the facts of this case. I would sustain the respondent herein and hold that the structures do not qualify for the investment credit. See *Robert E. Catron*, 50 T.C. 306, 315 (1968), and *Palmer Olson*, T.C. Memo. 1970–296, which approved in dicta as "reasonable and sound" the respondent's statement in Rev. Rul. 66–89, 1966–1 C.B. 7, that poultry houses are "buildings."

RAUM and DRENNEN, *JJ.*, agree with this dissent.

---

[2] The majority's reference to the so-called clarification in a Senate committee report relating to an automated structure for raising hogs is misleading. The committee obviously was of the impression, whether rightly or wrongly, that the structure did not involve any human activity of consequence—a situation different from that in the present case—and was more to be compared to such structures as blast furnaces, brickkilns, etc., which are not treated as "buildings." The facts herein call for the opposite conclusion.

QUEALY, *J.*, dissenting: While recognizing that the term "building" as used in section 48(a) (1) (B) should be accorded its "commonly accepted meaning," the majority nevertheless concludes that a rectangular structure 240 feet long and 51 feet wide, with a floor, sides, and a roof, and a ceiling height ranging from 8 feet to 14 feet, is not a building because it is used to house some 20,000 egg-laying chickens. In reaching this uncommon decision the majority apparently relies in part on the fact that the operation is largely mechanized so that the time workers spend in the building is reduced to a minimum. With this form of reasoning, I cannot agree.

In any modern commercial operation, whether it be producing eggs, cows' milk, or manufacturing television sets, the building which houses the operation may be specially designed for that purpose. Its utility for any other purpose will be limited. The equipment used in the operation will be attached to the building. None of these considerations make the structure any less a building as that term is commonly understood. If the Congress had wished to grant an investment credit for this type of building it should not have specifically excluded "buildings" without qualification in section 48(a) (1) (B).

DAWSON and DRENNEN, *JJ.*, agree with this dissent.