WALTER SHEFFIELD POULTRY COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walter Sheffield Poultry Co. v. Commissioner
Docket No. 222-77.
United States Tax Court
T.C. Memo 1978-308; 1978 Tax Ct. Memo LEXIS 208; 37 T.C.M. (CCH) 1282; T.C.M. (RIA) 78308; August 8, 1978, Filed Sander W. Shapiro and Monty G. Humble, for the petitioner. James N. Mullen, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Tax Year Ended
Deficiency
July 31, 1972
$ 5,902.26
July 31, 1973
2,402.57
Some adjustments in the notice of deficiency have been conceded by the petitioner. The two issues remaining for decision are: (1) Whether the petitioner's poultry structures are eligible for the investment credit provided by section 38, [1] and (2) whether the petitioner is entitled *209 to recover attorneys' fees under 42 U.S.C., Sec. 1988. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Walter Sheffield Poultry Company, Inc. (petitioner) is a corporation organized and existing under the laws of Texas. Its principal place of business is located in Smiley, Texas. For the fiscal years ended July 31, 1972 and July 31, 1973, the petitioner filed its Federal corporate income tax returns with the Internal Revenue Service at Austin, Texas. Petitioner is engaged in the business of producing chickens and eggs for consumption and fertile eggs for hatching. During the years in issue the petitioner expended the following amounts in the construction of structures to be used for the production of chickens and fertile eggs for hatching: No. of Structures
Date
Cost
4
9/71
$ 44,368.03
2
3/72
39,483.68
2
2/73
32,206.44
The facilities are subject to an allowance for depreciation and have a useful life in excess of 7 years. The sizes of the various structures *210 in question vary to some degree, but whether used for broiler production or breeder production all but one are 37-1/2 feet wide and 400 feet long, and one used for broiler production is 57 feet wide and 500 feet long. The structures have as sides chicken wire fencing stretched along their length attached approximately every eight feet to 4 inch X 4 inch timber posts sunk into the ground. Neither the structures themselves nor the timber posts rest on a foundation of any kind. The structures have no flooring but dirt, graded to a slight slope to facilitate watering and feeding of the chickens. In the structures used for the production of fertile eggs, slatted, removable wooden flooring, slightly raised off the ground, is placed at the periphery of the interior of the structure to enable hens to reach their nests, which are elevated above the dirt floor. Each enclosure has a roof of corrugated metal which rests upon the timber posts and which is additionally supported by timber posts placed in the center and running down the length of the enclosure. All equipment is suspended from the roof, including automatic feeding and watering equipment, equipment to provide localized heat *211 for very young chickens, exhaust fans and the like. The height of the roof at the periphery of the enclosure is approximately seven feet, and at the center is approximately ten feet. Corrugated metal doors are cut into the sides of the structures for access to the poultry and equipment inside. Larger metal doors are placed into the narrow ends of the enclosures to provide access for cleaning equipment. All of the equipment located within the enclosures is automatic. The feed is distributed by means of an electrically operated, self-timed conveyor system attached to the roof utilizing a trough and chain conveyor. Feed is supplied to the trough attached to the roof at preset times from a bin within the enclosures which automatically drains from an outside storage bin when the feed within is reduced to a preset level. Likewise, water pipes are attached to the roof and water is distributed through automatic waterers suspended from the ceiling. It is necessary to attach the feed, water, and heating systems from the roof in order periodically to raise such equipment during the growth period to accommodate the size of the chickens at any stage of growth. The number of chickens *212 in an enclosure varies depending upon the type of production. Most of the enclosures house 20,000 birds per enclosure. The chickens are kept in an enclosure for a prescribed period of days or months (depending upon the type of production), and are removed at approximately the same time. For broiler production the chickens are on an 8-week cycle; for production of fertile eggs, the hens are on a 56-week cycle. Employees of petitioner enter the enclosures to gather eggs (where appropriate), to place chickens in and remove them from the enclosure, and for periodic inspection and maintenance. The number of employees entering the enclosure, their functions, and the approximate times the employees spend in the enclosure are as follows: Broiler Chicken Production
No. of
No. of Hours Function
Persons
Frequency
Per Person
Clean automatic equipment
2
Twice a year
16 hours
Preparation time
2
Every 8 weeks
8 hours
Inspection & maintenance
1
Twice a day
1/2 hour
Harvesting
10
Every 8 weeks
2 hours
Stocking
1 or 2
Every 8 weeks
1-1/2 hours
Fertile Egg Production
Clean automatic equipment
2
Twice a year
16 hours
Preparation time
2
Every 56 weeks
8 hours
Inspection & maintenance
1
Twice a day
1/2 hour
Replacement of chickens
10
Every 56 weeks
2 hours
Stocking
2
Every 56 weeks
1-1/2 hours
Collection of fertile eggs
2
Daily
2 hours
*213 In addition to stocking and harvesting or replacing chickens, the work performed by humans within an enclosure consists of cleaning, inspecting and maintaining the enclosure and the equipment housed therein. No live bird is handled during the growing cycle. No specific work space is provided in an enclosure, and no facilities for humans are provided within an enclosure. The environment within an enclosure is unpleasant and unsuitable for prolonged work by humans. The enclosures are designed to provide heat to very young chickens through brooders, which are automatic butane heating devices suspended from the roof at various locations. In addition, polyethylene curtains are attached to the outside of the chicken wire fencing along the sides. The curtains can be rolled up to assist in controlling interior heat. Because chickens give off large amounts of body heat in the process of growth, cooling rather than heating the enclosure is the bigger problem. To facilitate cooling, exhaust fans are placed in the enclosures to stir the air, and the roof is insulated with a polyethylene substance which promotes cooling. The basic concept in poultry production is the conversion of *214 feed into meat or eggs. One of the functions served by a poultry enclosure is to help regulate the temperature and control the environment of the chickens so that this conversion can be accomplished most efficiently. If the enclosure were designed with walls instead of chicken wire, additional temperature control devices would be required to control the environment. The design of the enclosure has changed through the years as the genetics of the chickens and the nutrients in the food have changed. Except in rare instances, the enclosures are not used for any purposes other than poultry production. When such production ceases the enclosures are usually either abandoned or torn down. The enclosures have little, if any, residual value if not used for poultry production, and it is usually not economical to convert such enclosures to other uses. The enclosures serve as an intergral part of the production of broilers and eggs for hatching, and will be used only so long as the equipment which they house will be used. OPINION In this case respondent makes a valiant, though unsuccessful, attempt to remove Chicken Little from that structure known as "other tangible property" and *215 put her back in the "henhouse." [2] Unfortunately for respondent, he has run into the stonewall of stare decisis. We view this case as being controlled by our prior opinion in Satrum v. Commissioner,62 T.C. 413 (1974). If anything, the instant case appears stronger than Satrum.
Among the requirements necessary to qualify for investment credit provided in section 38[3] is that the property for which the credit is sought must be "section 38 property," as defined by section 48, which states in part: SEC. 48. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction * * *, or (ii) constitutes a research facility *216 used in connection with any of the activities referred to in clause (i), * * * Section 1.48-1(e)(1), Income Tax Regs., defines the term "building" as follows: (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, *217 warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. Petitioner contends that the enclosures were either "other tangible property" used as an integral part of *218 a production activity or were essentially items of equipment. To the contrary, respondent argues that the enclosures are inherently permanent structures which have the general appearance of buildings; that they are no different than other farm buildings; that they are not so closely related to the chicken and egg production process they house that the structures must be replaced when the interior equipment is replaced; and that the structures can be economically converted to other uses. Respondent also argues that the Satrum rationale is inapplicable for two reasons: (1) It is incorrect as a matter of law and (2) the pivotal factors set out in the regulations are not present in this case. We agree with the petitioner. In reaching its conclusion in Satrum, the majority opinion stated (62 T.C. at 416-417): In the instant case there is little doubt in our mind that the structure was specially designed as an integral part of the egg producing process. The sides of the structure did not have a normal wall, but rather had three louvered wall sections to enable proper control of ventilation. Closely spaced beams, which supported the roof and numerous coolers *219 located on the roof, were also necessary supports for the cages where the chickens were housed. Further the concrete floor sloped to provide a continuous water flow. Because of the sheet metal construction, the closely spaced beams, and the sloping floor, we do not believe that this structure could be economically used for any purpose other than for the specific purpose for which it was designed. Moreover we think it reasonable to expect replacement of the entire facility, if the property housed within were to be abandoned. Using this test, we think the facts of this case are more favorable to the petitioner than the facts in Starum were to the taxpayer in that case. A comparison of the pertinent facts in the two cases follows. 1. The height of the Satrum enclosures was from eight feet to fourteen feet at their utmost peak. The height of the enclosures here is from seven feet to ten feet at their uppermost peak. Since the instant enclosures are so low in height, the use of them for alternative purposes such as machinery storage or hay storage is a more remote possibility. In fact, elaborate construction would be required to raise the roof to meet the height problem. *220 2. The outer walls in Satrum were corrugated metal with louvers. The outer walls of the instant enclosures are nothing more than chicken-wire netting, with polyethylene curtains that can be raised or lowered. In addition, the Satrum enclosures had foundations and cement floors whereas the instant enclosures have no foundations and dirt floors. Thus, the construction of the instant enclosures is much less substantial than that in the Satrum case, and has much less the resemblance to a building. The construction of the instant enclosures is insubstantial, as indicated by the average cost of construction of an enclosure, i.e. $ 14,500 or approximately 85 cents per square foot. 3. The Satrum case indicates that a part of the construction cost involved was for purposes of remodeling existing structures. The evidence in this case is that no such remodeling is economically feasible, and that the enclosures become obsolete if abandoned and new enclosures are erected. 4. In both the Satrum case and the instant case the equipment inside the enclosures is supported by the roof which, in turn, is supported by braces or posts. The Satrum enclosures, *221 however, housed chickens in cages and provided concrete aisles between the rows of cages. The enclosures in this case provided no specific work space for humans. 5. Because of the nature of the Satrum operation - egg production - an employee was required to tend the electric feeder 40 minutes per day and two employees were required for 2 to 2-1/2 hours per day in egg collection. By contrast, in the instant case the maintenance required one employee's time inside a broiler enclosure for approximately one-half hour twice per day and in the fertile egg production enclosures an additional two employees to collect eggs at 2 hours per day. Thus, in broiler enclosures, the man-hours required of humans in the instant case were substantially less than those required in Satrum, and in the fertile egg enclosures the man-hours were somewhat less than in Satrum.
Here all the testimony was consistent that the design of each enclosure was specifically for the purpose for which it was used; that it was not economical to alter its use for another purpose; that, except in rare instances, such alteration was not attempted or known; and that it was reasonable to expect replacement *222 or abandonment of the entire facility if the property housed within were abandoned. During the trial of this case several witnesses were asked whether they considered the enclosures to have alternate uses. Mr. Sheffield testified that when his older structures became obsolete he abandoned them, as did others in the same business. He testified that in the 35 years or so that he had been in the poultry business he had heard of only one instance where an enclosure had been converted to another purpose - a swine raising facility. He testified that the enclosures here were not suitable to alternate uses such as hay storage, machinery storage or animal shelter. Mr. Majefski, who has had vast experience in evaluating agricultural businesses, and who has made some $ 20,000,000 in loans on behalf of his savings and loan association for poultry related enterprises alone over a period of 25 years, gave no residual value to the structures and considered that they would have no value except for poultry production. Mr. Head supported Mr. Majefski's testimony and stated that it was not economically feasible to convert an enclosure to another purpose. He stated that if he wanted a calf raising *223 structure he would build a more suitable structure from the ground up rather than convert an existing poultry structure. Mr. Newton, who has had considerable experience in the poultry industry, testified that he had never heard of an enclosure being used for another purpose, and that it was not economically feasible for an enclosure to be converted to other uses or used for any other purposes suggested to him. He did point out that, with money, an enclosure could possibly be converted into a courthouse, but said "who wants a courtroom out close to Smiley." Dr. Thornberry testified that, in his considerable experience, he had never know of an enclosure to be converted, and that, while he knew of many abandoned poultry enclosures whose owners would like to convert to alternate uses because of loans outstanding against the enclosures, they still stand abandoned. It is significant that the test of alternate use, as stated in Satrum, requires a showing of economic feasibility. In this case, Mr. Sheffield, Mr. Head, and Dr. Thornberry all testified that those who had abandoned enclosures and needed to find alternate uses for them could not do so and that conversion to any suggested *224 use was not economically feasible. Respondent stresses that the structures have the appearance of buildings. But appearance alone does not cause them to become ineligible for the investment credit. The greenhouses in Thirup v. Commissioner,508 F. 2d 915 (9th Cir. 1974), the whiskey aging structures in Brown-Forman Distillers Corp. v. United States,499 F. 2d 1263 (Ct. Cl. 1974), and the potato storage facilities in Rev. Rul. 71-359, 1971-26 C.B. 62, all have more the appearance of buildings than the enclosures here. But in each of those instances the facility was held to be eligible for the investment credit because it did not provide shelter, housing, working, office, display, sales or similar space for human activity. Neither do the enclosures in this case. The cases relied on by the respondent do not seem to support his arguments. Yellow Freight System, Inc. v. United States,538 F. 2d 790 (8th Cir. 1976), involved loading docks whose sole purpose was to provide work space for employees--to elevate the employees *225 to the level where they could easily reach the trailers which were loaded and unloaded. Between five and eighty employees spent up to a total of 1,925 man-hours per day inside the facilities. We think that case is no authority for the respondent in this case where employees of the petitioner spend one man-hour per day in the broiler houses for the limited purpose of maintaining the automatic equipment in the structures, and an additional four man-hours in the egg houses to remove the eggs. Starr Farms, Inc. v. United States, 78-1 USTC par. 9183, 41 AFTR 2d 78-504 (W.D. Ark. 1977), involved poultry structures quite similar in description to the Satrum structures, and the Memorandum Opinion in that case seems to stand for the proposition that the Western District of Arkansas will not follow this Court's opinion in Satrum. However that may be, the Starr Farm structures, unlike those of the petitioner in the instant case, had walls, a ceiling, insulation, two more feet of interior height, a concrete floor, and no rows of posts in the center of the structure and no apparent odor. Accordingly, we hold on this record that the structures were not buildings *226 but were used as an integral part of the poultry production activities. In view of this holding it is not necessary for us to consider the petitioner's alternative contention that the structures were also essentially items of equipment within the provisions of the regulations. We have previously held in Key Buick Co. v. Commissioner,68 T.C. 178 (1977), on appeal (5th Cir.), that the Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C., Sec. 1988, is inapplicable to proceedings in the Tax Court. Therefore, we decide this issue against the petitioner. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.↩
2. See Satrum v. Commissioner,62 T.C. 413, 418↩ (1974).
3. SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule.--There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. (b) Regulations.--The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.↩