THEODORE E. LUOMA and ESTHER A. LUOMA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Luoma v. Commissioner
Docket No. 1264-77.
United States Tax Court
T.C. Memo 1980-349; 1980 Tax Ct. Memo LEXIS 232; 40 T.C.M. (CCH) 1100; T.C.M. (RIA) 80349; September 2, 1980, Filed *232 Held, certain poultry structures are integrally related to the production of eggs entitling petitioners to an investment credit pursuant to sec. 38, I.R.C. 1954. Satrum v. Commissioner,62 T.C. 413 (1974) followed; held further, an egg-processing structure is not integrally related to the production of eggs and therefore is a building disqualified for an investment credit by the provisions of sec. 48(a)(1)(B), I.R.C. 1954. Alfred J. Weinberg, for the petitioners. *233 Dale L. Newland, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Sec. 6653(a) [1]
Year
Deficiency
Addition to Tax
1967
$ 5,352.00
$265.30
1968
5,230.29
261.51
1969
10,711.84
535.60
1970
8,264.21
295.96
After concessions, the sole issue for decision is whether petitioners' poultry structures are eligible for the investment credit pursuant to section 38.
FINDINGS OF FACT All of the facts have been stipulated and are found accordingly. Theodore E. and Esther A. Luoma, husband and wife, resided at Finlayson, Minnesota, when they filed their petition in this case. Petitioners timely filed joint Federal income tax returns for calendar years 1967, 1968, 1969, and 1970 with the District Director of the Internal Revenue Service at St. Paul, Minnesota. During the years at issue, petitioners owned and operated the Luoma Egg Ranch which was engaged in the business of producing and selling *234 chicken eggs and poultry to wholesale and retail outlets. At issue [2] are four structures acquired by petitioners which can be described as follows: Date
Building
Wall
Acquired
Number
Size
Height
7-1-67
2
32 feet X 186 feet
8 feet
11-1-67
13
44 feet X 156 feet
8 feet
8-1-68
1
32 feet X 186 feet
8 feet
11-1-68
6
42 feet X 348 feet
8 feet
Date
Roof
Wall
Acquired
Peak
Material
Cost
7-1-67
15-1/2 feet to 16 feet
Plywood
$18,790.35
11-1-67
15-1/2 feet to 16 feet
Plywood
20,024.00
8-1-68
15-1/2 feet to 16 feet
Plywood
15,525.16
11-1-68
15-1/2 feet to 16 feet
Cor. Metal
30,714.94
The structures are subject to an allowance for depreciation and have a useful life in excess of seven years. Building 13 is the egg-processing structure regularly used by five or more employees to collect, inspect and crate the eggs delivered to it from the structures housing chickens. Building 6 is a structure which is part of and attached to a larger structure designed in the shape of one-half of a wagon *235 wheel. [3] The hub of the wheel serves as a cooling room where the temperature is maintained at approximately 55 degree and as a packing room to facilitate the processing of eggs. The facility is highly automated with eggs rolling down a sloped cage system onto a conveyor belt that carries the eggs to a wider conveyor belt to deliver the eggs to the cooling room. The chickens are fed and watered automatically. Building 6 houses approximately 23,000 chickens. Buildings 1 and 2 are freestanding structures which house approximately 7,650 chickens each. Cages containing chickens are suspended from the rafters of Buildings 1, 2 and 6. To withstand this weight, these structures are reinforced by rafters and other supports spaced every four feet rather than the normal eight feet. This reinforcement also provides additional support for exhaust fans mounted on the roofs of the structures.
The floors of *236 these structures consist of 3-inch concrete slabs. The floors in buildings 1 and 2 have a pitch of 2 inches per hundred feet for the purpose of watering chickens, whereas building 6 does not have sloped floors because water is pressured to the cages. Between the rows of chicken cages running the length of the structures are 32-inch wide walkways. Beneath the rows of chicken cages are 82-inch wide droppings pits which are 8 inches deep. The droppings are removed with a 12 horsepower garden tractor pushing two 82-inch blades along the surface of the droppings pits. The tractor is driven on the 32-inch walkways between the rows of cages. Removal of droppings from Buildings 1 and 2 is done once a month and takes one man two days for each structure.Removal of droppings from Building 6 is done once every six weeks and takes one man three days to complete. The structures are not heated during the winter because the body heat of the chickens keeps the structures warm. During the summer, however, Buildings 1 and 2 are cooled with eight large 24-inch thermostatically controlled exhaust fans mounted on the roofs and twenty-two metal hooded 24-inch intake units mounted under the eaves *237 of each structure. Building 6 is similarly cooled but has eleven 48-inch exhaust fans and forty-four intake units. As of December 31, 1970, petitioners employed about fourteen individuals. Four gathered eggs, eight processed the eggs and two cleaned and repaired the structures. Members of petitioners' family also did some work. Buildings 1, 2 and 6, unlike Building 13, provided very little space for employees to work. All of the work performed by the employees in those structures was supportive of and ancillary to the production of eggs. Once every thirteen months laying hens are replaced. These hens are removed from the cages and loaded on trucks. The removal takes about a day after which another day is spent cleaning the structures. On the third day the new hens are taken from trucks and placed in the cages. Petitioners employed ten additional individuals for this operation. OPINION The sole issue is whether petitioners' poultry structures are eligible for the investment credit pursuant to section 38. [4] Among the requirements necessary to qualify for the credit, and the only requirement at issue herein, is that the property for which the credit is sought must be *238 "section 38 property," as defined by section 48, which states in part: SEC. 48. DEFINITIONS: SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction * * *, or (ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), * * * Section 1.48-1(e)(1), Income Tax Regs., defines the term "building" as follows: (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. *239 The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide *240 for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. Relying upon our opinion in Satrum v. Commissioner,62 T.C. 413 (1974), [5] petitioners contend that the poultry structures are either "other tangible property" used as an integral part of a production activity or are essentially items of equipment. Respondent, on the other hand, again attempts to remove Chicken Little from the structure known as "other tangible property" and put her back in the henhouse. [6] Respondent contends that the structures are clearly "buildings" which are disqualified for the investment credit pursuant to section 48(a)(1)(B). He claims that although Buildings 1, 2 and 6 are similar to the structures in Satrum, the decision in that case is wrong and that we are bound to follow the test in Yellow Freight System, Inc. v. United States,538 F. 2d 790 (8th Cir. 1976), under *241 the principle established in Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). With respect to Building 13, respondent contends that it is highly dissimilar to the poultry structures in Satrum in that it was designed primarily for human occupancy in the collection, inspection and crating of eggs. We agree with respondent with respect to Building 13. With respect to Buildings 1, 2 and 6, however, we find our decision in Satrum controlling and hold for petitioners. Buildings 1, 2 and 6 are virtually undistinguishable from the poultry structures in Satrum where this Court held that each facility was designed to function as an integrated unit and was qualified as other tangible property used as an integral part of the production of eggs. In reaching its conclusion the majority opinion stated: In the instant case there is little doubt in our mind that the structure was specially *242 designed as an integral part of the egg-producing process. The sides of the structure did not have a normal wall, but rather had three louvered wall sections to enable proper control of ventilation. Closely spaced beams, which supported the roof and numerous coolers located on the roof, were also necessary supports for the cages where the chickens were housed. Further the concrete floor sloped to provide a continuous water flow. Because of the sheet metal construction, the closely spaced beams, and the sloping floor, we do not believe that this structure could be economically used for any purpose other than for the specific purpose for which it was designed. Moreover we think it reasonable to expect replacement of the entire facility, if the property housed within were to be abandoned. [Satrum v. Commissioner,supra at 416-417.] In considering these factors with respect to Buildings 1, 2 and 6, we note that petitioners' poultry structures were designed, constructed and used for the single purpose of housing, raising and feeding chickens and collecting the eggs produced by the chickens. Building 6 was attached to a unique structure which was highly automated *243 for the conveyance of eggs and for the feeding and watering of chickens and which facilitated the processing of eggs. Each of the three structures had closely spaced rafters to support the weight of the exhaust fans mounted on the roof and the cages suspended from the ceiling. The floors of the structures have 32-inch wide walkways between the rows of cages and 82-inch wide droppings pits which are 8 inches deep. During the summer, the temperature in each structure is regulated by large thermostatically controlled exhaust fans and metal hooded intake units. The work performed and the time expended by humans in the poultry structures were merely supportive of and ancillary to the production of eggs by the chickens. In sum, when comparing the facts in Satrum to facts with respect to Buildings 1, 2 and 6 in the instant case, we believe petitioners have a stronger case than the taxpayers did in Satrum. The structures would virtually have no use other than that for which they were designed and the entire facility would have to be replaced if the property housed within were to be abandoned. Although this case is appealable to the Eighth Circuit, respondent's reliance on Yellow *244 Freight System, Inc. is misplaced. There the Court did apply both the function and appearance test in determining that the structure at issue was a building and thereby disqualified for the investment credit. In that case, however, the Eighth Circuit noted an exception to the application of the appearance test. Such exception pertains to structures which are so closely related to the property which it houses that it must be replaced contemporaneously with such property. Sec. 1.48-1(e)(1), Income Tax Regs. As hereinbefore stated, Buildings 1, 2 and 6 would virtually have no other use than that for which they were designed and the entire facility would have to be replaced if the property housed within were to be abandoned. Therefore, the appearance test does not alter our conclusion that Buildings 1, 2 and 6 are qualified for the investment credit. As to Building 13, however, we agree with respondent. Building 13 is an egg-processing building designed primarily for human occupancy in the collection, inspection and crating of chicken eggs which are already produced. That structure is clearly different from the other poultry structures at issue in this case and those in Satrum. *245 While the structure is absolutely necessary for the production of eggs, that does not in itself qualify it for an investment credit. There is nothing in this record to support a finding that the structure is an integral part of the production of eggs. If anything, by the time the eggs reach Building 13, the production process has terminated and the marketing process begins. Moreover, the human activity involved in preparing the eggs for the marketplace is quite substantial rather than supportive or ancillary. We are simply unable to find that Building 13 is anything but a building, the principal purpose for which is the preparation of already produced eggs for the marketplace. See Catron v. Commissioner,50 T.C. 306, 312-13 (1968).It is therefore disqualified for an investment credit by the provisions of section 48(a)(1)(B). In accordance with this decision, petitioners are entitled to investment credits for Building 2 in 1967 and for Buildings 1 and 6 in 1968. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
2. Petitioners have conceded that four other structures are ineligible for the section 38↩ investment credit.
3. The "wagon wheel" structure has five spokes including Building 6. The other four spokes were ineligible for investment credits pursuant to section 49 because they were not completely constructed prior to the temporary termination of investment tax credits on April 18, 1969.↩
4. SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule.--There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. (b) Regulations.--The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.↩
5. See also Walter Sheffield Poultry Company, Inc. v. Commissioner,T.C. Memo. 1978-308↩. 6. See Satrum v. Commissioner,62 T.C. 413, 418↩ (1974).