**CONSOLIDATED FREIGHTWAYS, INC. and Affiliates,**

v.

**The UNITED STATES.**

No. 168–69.

United States Court of Claims.

April 16, 1980.

James E. Merritt, San Francisco, Cal., attorney of record, for plaintiff. Morrison & Foerster, San Francisco, Cal., of counsel.

William A. Whitledge, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, for defendant. Theodore D. Peyser, Jr., Robert S. Watkins and Kenneth R. Boiarsky, Washington, D. C., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

KASHIWA, Judge:

Plaintiff brings this action seeking review of the report of Trial Judge Harry E. Wood, which denied plaintiff's right to an investment tax credit in certain dock facilities. For the reasons set forth below, we agree with the result of the trial judge, sustain defendant's offset and dismiss the petition.

## FACTS

This case arises from an offset asserted by defendant in its first amended answer to the petition. The offset placed in issue plaintiff's right to an investment tax credit (ITC) under I.R.C. § 38 [1] for 1964 due to investments in certain dock facilities [2] placed in service in plaintiff's taxable years 1962, 1963 and 1964.[3] Pursuant to a March 25, 1977, stipulation of the parties, the amount in issue before the trial judge was $69,437, representing an ITC attributable to a portion of plaintiff's investment in the dock facilities at each of the 12 terminals in the total amount of $991,964. Because of limitations upon the amount of the credit allowed in any one year and the carryover provisions, all of this ITC was claimed in 1964.

Each of the relevant terminal facilities considered by the trial judge included a dock facility which will be described generally *infra*. Only the amounts listed below were placed in issue by defendant's offset:

| Terminal Facility | Year Placed in Service | Investment in Dock Facility |
|---|---|---|
| Denver, Colorado | 1962 | $111,728 |
| Albany, New York | 1962 | 23,240 |
| Salt Lake City, Utah | 1962 | 58,632 |
| Chicago, Illinois | 1963 | 485,160 |
| Louisville, Kentucky | 1963 | 31,885 |
| Syracuse, New York | 1963 | 42,972 |
| Phoenix, Arizona | 1963 | 39,949 |
| Rockford, Illinois | 1963 | 25,017 |
| Boston, Massachusetts | 1964 | 46,675 |
| Detroit, Michigan | 1964 | 60,143 |
| San Francisco, California [4] | 1964 | 6,603 |
| Fort Wayne, Indiana | 1964 | 59,960 |
| Total | | $991,964 |

During 1964, Consolidated Freightways, Inc. (plaintiff) was the common parent of an affiliated group which included Consolidated Freightways Corporation of Delaware (CFCD) and Freightways Terminal Company, a wholly owned subsidiary of CFCD. Principally through CFCD, plaintiff furnished mainly general commodities [5] carrier service throughout the United States and Canada. At all relevant times, the terminal facilities listed above were owned and operated by CFCD or Freightways Terminal Company.

For the taxable years 1962, 1963 and 1964, plaintiff and its affiliated corporations filed consolidated federal income tax returns. In December 1967, defendant proposed deficiencies for the years 1963 and 1964, totaling approximately $1,070,000. In March 1968, plaintiff filed a timely protest and claimed, for the first time, that it was entitled to an additional ITC during the years 1962, 1963 and 1964 of $163,559.13, due to qualified investments in the 12 terminal facilities totaling $2,336,559.

Conferences were held between plaintiff and the Appellate Division, Internal Reve-

---

1. All references are to the Internal Revenue Code of 1954, as in effect in 1964.

2. The structures in issue will be referred to as the "dock facilities."

3. Trial was limited to the offset issue. Plaintiff's claim for costs, including reasonable attorneys' fees, was reserved for further proceedings. Because of our holding in favor of defendant, such proceedings are unnecessary.

4. Before the court, the San Francisco dock facility was conceded to be a "building" by plaintiff; as such, we need not consider it. Plaintiff contends this dock facility is materially different from the remaining dock facilities in issue—with heavy emphasis on the smaller number of openings in the San Francisco structure (no openings on two sides, one on another and five on the last side).

5. As opposed to a bulk carrier of special products which normally involves transporting only one type of material requiring specially designed equipment. Examples include gasoline and lumber carriers.

nue Service, San Francisco, California. At this conference the Government obtained the assistance of a Revenue Agent Engineer, who recommended plaintiff's claim for the additional ITC of $163,559.13 to be allowed to the extent of $154,512.75 and disallowed to the extent of $9,046.38. The Revenue Agent's report referred to, *inter alia*, Treas.Reg. § 1.48–1[6] and Rev.Rul. 68–1, 1968–1 Cum.Bull. 8.

On October 24, 1968, plaintiff excluded a Form 870. The Form 870 stated that it was not a final closing agreement and that its execution and filing would preclude neither the assertion of a further deficiency, should it later be determined an additional tax was due, nor the filing by plaintiff of a timely claim for refund or credit on which suit might be brought.

Shortly thereafter plaintiff paid an additional assessment plus interest for 1964 and then filed a claim for refund for that year in the amount of $450,391.48. This claim stated that the claimed ITC in certain terminals had been allowed in part and was not in dispute. The refund claim was disallowed.

Neither plaintiff's petition nor defendant's answer dealt with the truck terminal ITC issue. The claim for refund, however, was attached to the petition which, as stated above, asserted the truck terminal ITC issue was "not in dispute." The case was suspended pending settlement negotiations.

After discovery and further negotiations, the parties executed a stipulation wherein the defendant withdrew one offset asserted in its answer and plaintiff "[withdrew] its objection to defendant's motion to amend its answer in order to raise as an offset (not to exceed $69,437, plus interest) the issue of the investment credit for certain truck docking and terminal facilities." On the basis of the stipulation, defendant's motion for leave to amend its answer was allowed as to the ITC issue but otherwise denied.

At this date, the statute of limitations on refund claims prevented plaintiff from claiming a refund of the $9,046.38 ITC disallowed by the Service.

Each of the dock facilities before us is part of a larger terminal facility which among other things contains an adjoining or contiguous dock office area (which is not in issue). Each dock facility except Chicago was rectangular, ranging in size from 60 by 120 feet at Louisville, Rockford and Syracuse to 100 by 312 feet at Denver.[7] At most of the terminal facilities, there was a basement under the dock office area. This basement typically contained a restroom, a lunchroom, and a locker room. At some terminal facilities, there was a second story located immediately above the dock office area containing general office space. The second story of these terminal facilities was constructed in the same general manner as the dock facility (i. e., normally a pre-engineered metal structure), except that the Denver facility located the general office area at the end of the terminal facility, and was of brick veneer construction.

Generally, all of the dock facilities (except at Chicago) were constructed with rectangularly shaped platforms, consisting of a reinforced concrete slab, normally 6 inches thick, at a height of from 48 to 52 inches above the ground.[8] The platforms ranged in size from approximately 40 by 60 feet to 100 by 312 feet. The platforms rested on perimeter foundation walls; the empty space beneath the slab (and within the foundation walls) was filled with dirt, compacted fill or both.

The dock facilities shared at least one common wall with the rest of the terminal facility. Except for the Albany dock facility (which was of concrete block construction), each dock facility consisted essentially of a pre-engineered metal structure atop (and anchored to the edge angles of) the

---

6. As added by T.D. 6731, May 8, 1964.

7. The Chicago dock facility was built in a "T" shape consisting of three rectangles joined together. The top of the "T" is 652 by 80 feet. The leg of the "T" is 300 by 80 feet.

8. This height facilitated employee access to the bed of the trailer while the truck was being loaded or unloaded at a bay.

above-described platform. These steel structural components were obtained from either Butler Manufacturing Company,[9] Armco Steel Building or Inland Steel Building. Such components allow for the construction of a structure using prefabricated metal components of common design, generally available from inventory. The interior height was usually 13 to 14 feet. The dock facilities also had structural steel columns (normally 11 to 12 feet in height and approximately a foot wide), crossbeams at 22- to 24-foot intervals and side panels generally of steel. All the dock facilities had roofs, usually made of enameled steel panels. At some facilities skylights were inserted. At most of the dock facilities there was a roof overhang of from 5 to 10 feet beyond the edge of the dock facility.

The 22- to 24-foot intervals between the structural steel columns were called bays; each such bay was divided by a nonstructural steel column into two truck bays, into each of which a trailer could be backed for loading or unloading. Except for the Phoenix dock facility which had no overhead doors,[10] each truck bay was fitted with an overhead door. These doors were installed on tracks welded to a structural steel column and a nonstructural one. Each such door could be closed and locked when there was no trailer in the truck bay. When closed and locked, the interior of the dock facility was protected both from the elements and unauthorized persons. These doors were closed when the terminal facility was closed and might be closed when rain or snow was blowing across the dock facility floor during loading or unloading operations. Also, such doors would be closed when the truck bay was in an inoperable condition. The overhead doors were required to be open, however, during the loading and unloading process. The area between the top of the overhead door and the roof of the dock facility was covered, typically with prefabricated steel panels.

The dock facilities all had electrical lighting and electrical outlets. Time clocks for the employees were in most of the dock facilities. Three dock facilities had intercom terminals, and the Chicago dock facility had telephones. No heating or air conditioning was provided within the dock facilities, and portable heaters were prohibited.

The operations of plaintiff typically were: local pickup of the shipment, delivery to the dock facility at the origination terminal facility and transfer of the shipment from the local pickup trailer to a line haul (long distance) trailer unit; transportation of the shipment via a line haul motor carrier unit to the dock facility at the destination terminal facility; and delivery, by the local delivery unit, of the shipment to its designated recipient. Plaintiff provided "line haul" services,[11] "break bulk" services [12] and "interline" shipments.[13]

9. The Yellow Freight Systems, Inc. v. United States, 538 F.2d 790 (8th Cir. 1976), rev'g and rem'g 413 F.Supp. 357 (W.D.Mo.1975), dock facilities were all pre-engineered metal structures, many provided by Butler Manufacturing Co. At least one was a Butler "Widespan" building—the same Butler series used by plaintiff here.

10. The Phoenix dock facility (120 feet long by 50 feet wide) and truck bays (without overhead doors) on all four sides. Climatic conditions and a security guard service made such doors unnecessary. Additionally, there was a 10-foot roof overhang over the open truck bays. At one corner of the dock facility, a walled-off area (about 24 feet by 24 feet) enclosed a dock office and dispatch room, an equipment room, restrooms and a storage room. The floor of the walled-off area was 3 feet above the floor of the dock facility. There was a second story containing general and private offices above this

walled-off area. There also was a basement containing a lunchroom and restrooms. There was steel paneling on the two shorter sides of this facility (interrupted by two bays on each side) and steel paneling enclosing the dock office area on another side of the dock facility. The fourth side contained little or no paneling. This facility was constructed utilizing Butler prefabricated steel components.

11. Plaintiff's line haul services consisted of long distance carriage of freight shipments performed in motor carrier units which were similar in appearance to many of the local pickup and delivery units, but which were in condition to perform the more demanding line haul service.

12. Break bulk services consisted of moving freight shipments from one line haul trailer across the floor of a dock facility (at a terminal facility between the shipment's origin and des-

13. See note 13 on page 867.

After a trailer entered the terminal facility and was processed, it was brought to an open truck bay at the dock facility where it was unloaded. Empty outbound trailers were also stationed at open truck bays to receive the freight being unloaded.

Human activity was required in the movement of freight into, across the floor of and out of a dock facility. In general, terms, after a trailer was positioned in the bay to be unloaded, the driver would take the bills of lading covering that freight to the dock office where the bills would be marked to indicate destination and to which truck bay the freight should be taken for loading. These bills were then given to a dockman who was responsible for unloading the freight. The dockman unloaded the trailer using physical effort or mechanized or nonmechanized equipment (e. g., hand carts, dollies or forklifts). Sometimes freight was moved directly from one trailer to another by means of a conveyor. When this was done, freight was not moved across the floor of the dock; but human labor was involved in the process. While freight was being unloaded, the shipments were checked, inside the dock facility, for overages, shortages and damages. If any problems were discovered, such freight was staged (i. e., placed in an area of the dock reserved for this temporary storage) until the problem was resolved.

Shipments without any problems were moved directly across the floor of the dock facility by hand or by the use of various equipment. Three dock facilities used a "towveyor" system [14] whereby freight was moved by loading freight into carts by human effort, hooking the carts onto the towveyor chain, unhooking the carts at the

proper location, unloading the carts and then loading the freight into the trailers. After the freight was removed from the trailer and brought to the bay where it was to be shipped, it would either be staged or loaded immediately.

While a trailer was being loaded, the dockman filled out a loading manifest, which was essentially a list of the freight loaded into a trailer, including its nature and weight. This was filled out either on a stand provided in the dock facility or it was taped to the wall of the trailer.

The trial judge determined plaintiff's structures were "buildings," based on both appearance and function; hence, no ITC was allowed. Plaintiff excepts to this decision on several alternative grounds, either: (1) the defendant is estopped from denying the dock structures are section 38 property; (2) the dock facilities are not "buildings"; (3) the dock facilities are "machinery" or "equipment" and, thus, not a "building" under Treas.Reg. § 1.48–1(e)(i); or (4) the dock facilities are not "buildings" because they "[house] property used as an integral part of an activity specified in section 48(a)(1)(B)(i)."

### ESTOPPEL

Plaintiff asserts two grounds on which the Government should be estopped from asserting the 1964 ITC offset issue. First, plaintiff claims that the Government's assertion of the offset after the closing of the refund period for 1964 prejudiced plaintiff by its resulting inability to claim the $9,046.38 of ITC disallowed on audit. Plaintiff contends it relied to its detriment upon the 1964 deficiency determination set forth in the Form 870 agreement.

tination) to another line haul trailer in which the shipments would then be carried to another terminal facility.

13. Interline shipments entailed plaintiff and another carrier combined in carrying the freight shipment from origin to destination. The shipment had to be transferred, at some point between origin and destination, from one carrier's trailer to the other's, which would then carry the shipment to its ultimate destination.

14. A dragline or heavy-duty chain, mounted in a "V"-like groove in the floor of the dock facility and pulled by a motor, moving the dock carts from one location to another part of the dock facility. Such systems were located at the Salt Lake City, Chicago and Denver facilities.

■ Our answer to this first ground is that the Form 870 (authorized by section 6213(d)) is merely a waiver by plaintiff of the statutory notice requirements imposed upon the Commissioner by section 6213(a). No agreement purporting to bind the Government or plaintiff was ever reached by the parties. Indeed, under the clearly expressed terms of the Form 870, plaintiff was never prevented from raising the $9,046.38 ITC issue.

Although plaintiff believes our ruling in *D.D.I., Inc. v. United States*, 199 Ct.Cl. 380, 467 F.2d 497 (1972), *cert. denied*, 414 U.S. 830, 94 S.Ct. 61, 38 L.Ed.2d 65 (1973), should control the case before us, we disagree. *D.D.I., Inc.* was based on our decision in *Guggenheim v. United States*, 111 Ct.Cl. 165, 77 F.Supp. 186 (1948), *cert. denied*, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441, *rehearing denied*, 336 U.S. 911, 69 S.Ct. 513, 93 L.Ed.2d 1075 (1949). *Guggenheim* found estoppel against the taxpayer based on an altered Form 870, which stated no reopening would be allowed in the absence of "fraud, malfeasance, concealment or misrepresentation of material fact." The court held that, based on the facts of that case, the parties intended a settlement with no reopening allowed except in the case of fraud, malfeasance, etc.

In *D.D.I., Inc.*, we found estoppel against the taxpayer based on a Form 870 plus additional letters between the parties. These letters were found by the court to be an offer and an acceptance of a final settlement. No such facts are present in the instant case. As such, *D.D.I., Inc.* and *Guggenheim* are inapposite. No estoppel can be found under these facts; plaintiff was never precluded in any manner from asserting the claim against defendant, thus there was no reasonable reliance by plaintiff to justify this equitable relief.

15. "SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

"(a) *General Rule.*—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

■ Plaintiff's second ground for estoppel is the argument that it detrimentally relied on Rev.Rul. 68–1, 1968 Cum.Bull. 8, which was subsequently "revoked," as applied to plaintiff, by Rev.Rul. 71–203, 1971–1 Cum.Bull. 7. Rev.Rul. 68–1 allowed portions of a terminal facility to be eligible for ITC treatment (e. g., yard lights, paved yards, concrete aprons, etc.). It did not rule on dock facilities. The Revenue Agent Engineer involved in the settlement negotiations evidently based part of his recommendation (allowing a partial ITC) on Rev.Rul. 68–1. However, this position was never finalized by a binding settlement; and the publication of Rev.Rul. 71–203, which did rule on dock facilities (denying their eligibility for ITC treatment), did not constitute a change in the public position of the Internal Revenue Service. As such, we feel there was no abuse of discretion under section 7805(b) nor any basis for estoppel.

Rejecting both of plaintiff's bases for estoppel, we hold defendant is not estopped to place its offset in issue.

## MERITS

We must now decide whether plaintiff's investments in dock facilities qualify for the credit provided in section 38.[15] Because of the parties' stipulation of all other relevant issues, the only requirement at issue here is that the dock facilities must be "section 38 property," as defined by section 48, which states in part:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) *Section 38 Property.*—

(1) *In General.*—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (*not including a building and its structural components*) but only if such property—

"(b) *Regulations.*—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B."

(i) is used as an integral part of manufacturing, production, or extraction *or of furnishing transportation,* communications, electrical energy, gas, water, or sewage disposal services, * * *. [Emphasis supplied.]

Before us the defendant contends that the dock facilities are "buildings." Plaintiff asserts the structures are "other tangible property" used as an integral part of furnishing transportation services.

Based on the authority given it by section 38(b), defendant has defined the term "building" as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such proper-

ty and the fact that the structure could not be "economically used for other purposes." Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. [Treas.Reg. § 1.48–1(e)(1).]

Plaintiff's contention that the dock facilities are not "buildings" is based on a conjunctive two-part test derived from Treas. Reg. § 1.48–1(e)(1). First, a "building" must have normal walls enclosing a space within. Second, the structure must function as a "building." According to plaintiff, its dock facilities "fail" both tests and, as such, are not "buildings" under Treas.Reg. § 1.48–1(e)(1). Plaintiff stresses that its dock facilities do not have normal walls; generally the bay doors are open while freight is being loaded or unloaded (the Phoenix facility has no doors), no space can therefore be "enclosed within" and, accordingly, the first test has not been satisfied. Plaintiff also contends the function of the dock facilities is to facilitate the movement of freight, not to provide working space therein, and, as a result, the second test has not been satisfied. Plaintiff has isolated the major areas of our inquiry, which will now be considered individually.

The first test, the "enclosure of space within 'normal' walls," is derived from the second sentence of Treas.Reg. § 1.48–1(e)(1): "The term 'building' *generally* means any structure or edifice enclosing a space within its walls, and *usually* covered by a roof, * * *." [Emphasis supplied.] [16]

Plaintiff's analysis of this test can be summarized as follows. Because the legislative history and the regulations provide the caveat "usually" before the discussion of a roof, yet omit a similar caveat before the provision of "enclosing a space within walls," in all events a "building" must have

---

**16.** This definition is derived from the legislative history of the Revenue Act of 1962. H.R.Rep. No.1447, 87th Cong., 2d Sess. 516 (1962), *re-printed in* 1962–3 Cum.Bull. 402, 516; S.Rep. No.1881, 87th Cong., 2d Sess. 858 (1962), *re-printed in* 1962–3 Cum.Bull. 703, 858–859.

normal walls which include a space within.[17] Since the doors are open when freight is being loaded or unloaded, there is no "enclosure of space" within walls and, therefore, the dock facilities are not "buildings."

The portion of the regulations quoted immediately above is the basis for what courts refer to as the "appearance" test (i. e., the structure looks like a "building"). *Thirup v. Commissioner*, 508 F.2d 915, 918 (9th Cir. 1974), *rev'g* 59 T.C. 122 (1972). *See Yellow Freight Systems, Inc. v. United States, supra* note 9. Of course, if a structure does not appear to be a "building," it is not a "building." There is no dispute with such a case; the problem which has arisen is that courts have held structures which appear to be "buildings" not to be "buildings." *Brown & Williamson Tobacco Corp. v. United States*, 369 F.Supp. 1283 (W.D.Ky.1973), *aff'd per curiam* 491 F.2d 1258 (6th Cir. 1974) (tobacco sheds); *Catron v. Commissioner, supra* note 17 (refrigerated one-third of a metal quonset hut). Because of this imprecision of the appearance test, we place the major emphasis on a "functional" test.[18] *Brown-Forman Distillers Corp. v. United States*, 205 Ct.Cl. 402, 416–418, 499 F.2d 1263, 1270–1271 (1974).

The trial judge in the instant case found that based on photographs in the record and a view of the Fort Wayne terminal facility, the dock structures in both design and appearance resemble "buildings." In *Yellow Freight Systems, Inc. v. United States, supra*, the Eighth Circuit also held structures nearly identical in appearance to plaintiff's dock facilities were "buildings." This result was reached even though that court recognized the structures "[had] no clearly discernible walls." In fact, three of the facilities were open 24 hours a day, 7 days a week, had no doors and, hence, had openings at all times.

We agree with the Tax Court, which stated in *Catron v. Commissioner*, 50 T.C. at 312 n.4, that Treas.Reg. § 1.48–1(e)(1) furnishes only a general description which does not attempt to prescribe exactly what are the outer limits of what is properly characterized as a "building." *See also Endres Floral Co. v. United States*, 450 F.Supp. 16, 23 (N.D.Ohio 1977), *appeal docketed*, No. 78–1340 (6th Cir. March 21, 1978).

The purposes of walls include supporting the roof, sheltering the inside of the structure from adverse weather conditions occurring in the region, preventing unauthorized entry and allowing access to the inside of the structure by the requisite number of "doors" or openings to accommodate the purpose of that "building."

The trial judge found the area between the top of the overhead door and the roof was covered, generally with prefabricated steel panels. In addition, at most of the facilities there was a roof overhang (of up to 10 feet) beyond the edge of the dock facility. Such overhangs were found to protect the dock facilities, and the freight therein, from the elements when the truck bay doors were open. In addition, the trial judge found that when snow or rain was blowing across the dock facilities, the doors might be closed.

Therefore, the trial judge is correct that although there were no solid, unbroken "walls" in the traditional sense, the common wall (or walls), the roof overhang, the steel columns and the overhead doors amount to "walls enclosing space" within the meaning of Treas.Reg. § 1.48–1(e)(1). Plaintiff's focus resting solely on the open bays is, in this case, too restrictive. Further, we do not feel the trial judge's "reliance" on Rev.Rul. 68–209, 1968–2 Cum.Bull. 16 (a "cf." citation), which was revoked subsequent to the issuance of his report by Rev.Rul. 79–183, 1979–24 I.R.B. 7, rendered his report in error.

---

**17.** Plaintiff asserts "normal" walls are required. This language is found in neither the regulations nor the legislative history cited to us. We do not feel so restrained. *Cf. Catron v. Commissioner*, 50 T.C. 306 (1968).

**18.** As an example of how confusing this determination can be, we note that plaintiff itself treated the gain on the sale of its Detroit and Albany facilities in part as section 1250 gain and in part as section 1231 gain—section 1245 gain was not reported.

Therefore, plaintiff's dock facilities do appear to be "buildings," and the first requirement is satisfied. Since these structures do look like "buildings," this case, as in *Brown-Forman*, is resolved by a determination of the function of the structures.

■ *Brown-Forman* involved whiskey aging houses, in which whiskey distillate was matured prior to bottling. The structures involved were found to function as mild "ovens"[19] maturing the whiskey, and no work space was found to be contained therein. As in *Brown-Forman*, we believe the mere fact that the structure has features in common with a "building" is not determinative; the dispositive issue is whether the structure functions or is used as a "building" in that taxpayer's hands. As such, "a major inquiry [is] whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure." 205 Ct.Cl. at 418, 499 F.2d at 1271.

Defendant believes the function of the dock facilities is to provide a sheltered working space for the movement of freight by the employees. Plaintiff contends there was a limited quantity and nature of human activity and, as such, the dock facilities functioned to facilitate the movement of freight and did not provide a sheltered working place. According to plaintiff, the "activities of the employees on the docks were all directly related to and incidental to movement of freight and equipment in furnishing transportation services." In support of this proposition, plaintiff notes that no restrooms, lockers or eating areas were provided on the docks, nor was the air either cooled or heated—the employees dressed "as if they were working outside."

We do not find the lack of any convenience areas on the dock facilities themselves to be of much weight. Such features were provided in the dock office structures adjoining the dock facilities, and no redundancy is required.

■ In determining the function or use of the structure, there is some controversy over the method of characterization of the human activity in the structure. *Compare Yellow Freight Systems, Inc. v. United States*, 538 F.2d at 797 n.11, with *Thirup v. Commissioner*, 508 F.2d at 919. In order to ascertain the structure's function or use, we feel we must examine the plaintiff's use of the structures, which necessarily requires some examination of the human activity within them. This was done in *Brown-Forman* and also in *Satrum v. Commissioner*, 62 T.C. 413, 417 (1974) (reviewed by the court). But in deciding whether the human activity is merely incidental to the function or use of the structure or whether that structure functions to provide working space for employees, more than merely the amount of such activity must be considered. *Brown-Forman* did not look to a cut-off figure at which point a mathematical computation of the hours of human activity within the structure would reveal the answer.

However, a review of plaintiff's position leads us to believe that plaintiff relies too heavily on the end result of the structure— freight starts at one end of the structure in an inbound truck and ends up at the other end in an outbound truck and thereafter is delivered to the recipient. In this regard, plaintiff focuses on the floor of the structure evidently viewing it as some sort of "conveyor," without any satisfactory examination of the intervening elements or the surrounding structure.

We admit the raised dock facility floor does facilitate the efficient movement of the freight, but this analysis ignores the effect of the structure surrounding the floor of the dock facility and the means of movement of the freight within (human labor). Regardless of whether a towveyor is considered, men must still move the freight out of the trucks onto the floor and then remove such freight from the floor into an outbound truck (and if no towveyor is used, human activity must move the

19. They acted as ovens by regulating the air temperature and humidity surrounding the whiskey aging casks, thereby controlling the temperature and chemical activity of the whiskey inside the casks.

freight across the floor as well). Neither the raised floor of the dock facility nor any other part of the structure provides this process without human labor.

Plaintiff argues that the ITC was adopted to give taxpayers incentive to modernize specific industries, such as the transportation industry. *E. g.,* S.Rep.No.1881, 87th Cong., 2d Sess. (1962), *reprinted in* U.S.Code Cong. & Admin.News, pp. 3297, 3304, 3314 (1962). It further alleges that the purpose of the functional test is to identify those structures so interrelated with the activities Congress sought to encourage that such structures should qualify for the ITC. Relying on this general maxim, plaintiff asserts its structures, because of their specialized construction (i. e., the platforms), are so interrelated in the movement of freight that the ITC should be allowed.

It is beyond dispute that Congress sought to stimulate the economy via the ITC. But it is equally clear that Congress mandated in section 48(a)(1)(B) that "buildings" do not qualify for such treatment.[20] Plaintiff's argument, essentially one of policy, does not provide much assistance in determining what is a "building"; it is more useful in determining whether the requirement of section 48(a)(1)(B)(i) is met. *Cf. Endres Floral Co. v. United States,* 450 F.Supp. at 23. The legislative history of the ITC indicates the term "building" is to be given its commonly accepted meaning. H.R.Rep.No.1447, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 Cum.Bull. 402, 516; S.Rep.No.1881, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 Cum.Bull. 703, 858–859. Section 38(b) gave the Treasury the authority to promulgate the regulations necessary to carry out the ITC. In response, Treas.Reg. § 1.48–1(e)(1) defines the term "building" for purposes of section 48(a)(1)(B) (*see* p. 10 *supra*). This regulation has been declared valid (*Yellow*

*Freight*, 538 F.2d at 795–796), and we feel that in the present case our examination (based on Treas.Reg. § 1.48–1(e)(1)) of whether the structure functions to provide a sheltered working space more precisely delineates what is a "building" for purposes of section 48(a)(1)(B).

We distinguished the whiskey maturation facilities in *Brown-Forman* from the greenhouses considered in *Sunnyside Nurseries v. Commissioner,* 59 T.C. 113 (1972), and held by the Tax Court to be "buildings." The greenhouses were characterized as follows:

> * * * A corps of petitioner's employees regularly spent full workdays inside the structures, engaging in a broad range of activities related to the processing of commercially marketable plants. As many as 50 persons sometimes worked in a greenhouse at once, often making use of an assortment of machinery and equipment. All of these characteristics are associated with "buildings" as that term is commonly understood. [205 Ct.Cl. at 418, 499 F.2d at 1272, *quoting* 59 T.C. at 119–120.]

The whiskey maturation facilities were distinguished because:

> Unlike the present case, the greenhouse facilities in *Sunnyside* plainly served as working areas in conjunction with their function of conditioning the environment. The case thus reinforces plaintiff's position. Here no substantial employee activity takes place in the maturation facilities. The basic activity consists of loading and unloading of goods, together with some maintenance and repair, all occurring at infrequent intervals of time. [205 Ct.Cl. at 418, 499 F.2d at 1272.]

Therefore, in determining whether the structure provides working space for employees which is more than merely inci-

---

**20.** In 1962, Congress passed the ITC provisions and contemporaneously passed section 1245. Section 1245 closed a loophole allowing the conversion of ordinary income into capital gain with respect to certain dispositions of depreciable property. Because of the benefits provided in the ITC provisions, enacting section 1245 was felt to be especially desirous. S.Rep.No. 1881, 87th Cong., 2d Sess. (1962), *reprinted in* U.S.Code Cong. & Admin.News, p. 3398 (1962). The same "building" exclusion provided in section 1245 was placed in section 48. In 1964, Congress enacted section 1250 (Pub.L.No.88–272, § 231(a), 78 Stat. 100). Section 1250 provided a milder depreciation recapture with respect to "buildings."

dental to the principal function or use of the structure, we must examine the frequency of the human activity inside the structure, how essential such activity is to the basic process or use involved and how substantial that activity is. Although we do consider the amount of human activity within the structure, we do not base our decision solely thereon. The human activity must be considered both qualitatively and quantitatively to properly characterize its relationship to the principal function or use of the structure involved.

In *Brown-Forman*, the basic process was the chemical activity resulting to the distillate from the changes in its temperature. This was caused and controlled by the temperature and humidity of the air surrounding the casks, which was regulated by the structures. The essential human activity was a periodic checking or changing of the temperature and humidity. The controls necessary to accomplish this were located on the outside of the structure.[21] The other human activity was infrequent and insubstantial, consisting of loading and unloading, repairs and maintenance, and was incidental to this "oven" function of the structures. The keys to the doors of the structures were in the custody of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service and access could be gained only under supervision of employees of that Division.

█ Unlike *Brown-Forman*, the basic function or use on our facts is the movement of freight. The essential human activity within the structures consists of the manual labor expended in moving the freight, temporarily staging the freight and checking for overages, shortages and damaged freight. Nothing about the structures allowed for this basic function to occur without this essential human activity. A substantial number of employees were provided for this purpose[22] and this indispensable human activity occurred on a daily basis.

Although the employees may have dressed "as if they were working outside" (because of the lack of heating or air conditioning), the simple fact is they were not. The roof, the roof overhang, the doors and the walls protected the employees and the freight from rain, snow and the sun and allowed freight to be moved when inclement weather would otherwise prevent it. Also, the design of the structures provided an efficient working space for the employees, as the distances between the points of unloading and loading evidently were reasonably short. In light of the above, we hold that the dock facilities function to provide a sheltered working space for employees, the human activity cannot be characterized as merely incidental or ancillary to the movement of freight and, therefore, the dock facilities are "buildings."

Two final arguments presented by the plaintiff are (1) the platforms are machinery or equipment and, under Treas.Reg. § 1.48–1(e)(1)(i), are not "buildings," and (2) under Treas.Reg. § 1.48–1(e)(1)(ii), the dock facilities are not "buildings" because they "[house] property used as an integral part of an activity specified in section 48(a)(1)(B)(i)."

Only the first contention was presented to the trial judge, who properly rejected it. The dock facilities played no operative role in themselves in the loading, unloading and staging of freight. Examining the dock facilities in their entirety, we do not feel they are any more a machine or equipment

---

21. Except for roof vents which were manually controlled by chains reached from the center aisle. These apparently were left open during the warmer months and closed in October when heating of the structures was then required.

22. For example, at the Fort Wayne terminal facility (which the trial judge found to be typical of the relevant facilities), 32 persons were regularly employed; of those, 23 regularly spent substantial amounts of time on the floor of the dock facility while performing their normal duties. These employees included the terminal manager, a dock foreman, two dock foremen/city dispatchers, eight dockmen, ten driver/salesmen and one over, short and damaged clerk. The percentage of time on the floor ranged from 95 percent for the over, short and damaged clerk to 25 percent for the dockmen.

than any commercial building efficiently constructed. The Eighth Circuit agrees and said: "[T]he [dock facilities] * * * are directly involved in expediting the movement of goods in taxpayer's transportation business. But to characterize them as 'machines' or 'equipment' on this account would distort the commonly accepted meaning of such terms." *Yellow Freight Systems, Inc. v. United States,* 538 F.2d at 797.

We also disagree with the plaintiff's second contention on the ground that the dock facility should be considered as a whole. The platform is merely the floor of a "building," not "property used as an integral part of [the transportation industry]," as those words are reasonably defined in their context in the regulation. Also, these structures do not satisfy the factors set forth in Treas.Reg. § 1.48–1(e)(1)(ii). We do not feel the pre-engineered metal structure is specially designed to provide for any stress that the platform may exert, nor has there been a showing that these structures could not be used "economically for other purposes." Therefore, we also find the dock facilities do not "[house] property used as an integral part of an activity specified in section 48(a)(1)(B)(i)."

## MOTION TO AMEND THE PETITION

 Shortly before oral argument, plaintiff filed a motion for leave to amend the petition to conform to the evidence, the purpose of which is to amend the petition to reduce defendant's claimed offset by the amount of the ITC to which plaintiff claims it is entitled by reason of investment in certain overhead doors, fences, a sign and yard lights. Defendant objects on the grounds that granting of the motion would prejudice defendant and would allow plaintiff to place in issue matters neither addressed nor proved in the trial of this case.

First, the trial judge concluded that the overhead doors are "structural components of a 'building'" and, therefore, not section 38 property. Additionally, the trial judge concluded that no proof was submitted with regard to the fences, yard lights or sign. Second, the parties agreed by stipulation to defendant's offset of $69,437, and plaintiff's amendment seeks to place in issue overhead doors at structures not involved in this case and other ITC items which defendant is precluded from reducing by way of offset because of the stipulation and order of the trial judge.

In light of the above, we do not feel such an amendment would be appropriate at this late date; also, we doubt whether there is sufficient evidence from the "proof" submitted (photographs which *inter alia* showed the items) at trial to sustain these items as section 38 property.

Accordingly, plaintiff's motion for leave to amend the petition to conform to the evidence, submitted without oral argument, is denied.

## CONCLUSION OF LAW

Defendant is not estopped to raise the ITC offset issue, and because the dock facilities are "buildings" and do not otherwise come within section 48, no ITC is allowed for these items. Further, plaintiff's motion for leave to amend the petition to conform to the evidence is denied. Accordingly, defendant's offset is sustained in full and the petition is dismissed.