**A.C. MONK AND COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 78–126–CIV–4.**

United States District Court, E.D. North Carolina, New Bern Division.

Nov. 1, 1983.

James R. Trotter, Rocky Mount, N.C., for plaintiff.

Richard F. Mitchell, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

This tax refund action was tried to the court without a jury in June of 1980, and from the judgment thereafter entered both parties appealed. The judgment was affirmed in part, reversed in part and remanded in part. *A.C. Monk & Company, Inc. v. United States,* 686 F.2d 1058 (4th Cir.1982). The unresolved issue as to which the case was remanded concerns plaintiff's claim for investment tax credits for items of electrical equipment installed in its factory and office buildings in the early 1970's. The action came on for trial to the court without a jury on this remaining issue in March, 1983 following which the parties in due course filed proposed findings of fact and post-trial briefs. The court now records its findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Plaintiff's tobacco processing plant is located at Farmville, North Carolina in a single-story rectangular building which contains almost nine acres of floor space. The plant and the machinery located therein operate on electric power provided by the utility company which maintains a transformer located on plaintiff's property just outside the factory building. After entering the factory building the electric power flows through two main distribution panels connected by a 275-foot, 3,000 ampere bus duct. From these distribution panels the power flows to numerous conduits, transformers and switches until it reaches the various motors which operate the factory machinery. Electricity for the factory lighting and the operation of other appliances needed in the factory also flows through these distribution panels.[1]

Electricity for lighting and the operation of the various appliances in plaintiff's office building flows from the utility company's transformer mentioned above through a six-inch conduit to a main distribution panel in the office. For a more detailed description of the electrical system serving the office reference is made to plaintiff's proposed findings of fact Nos. 20 and 21 which the court adopts as its own.

At the first trial the plaintiff's total cost of installing the electrical systems for the factory and the office was found to be $341,866.00. The Internal Revenue Service allowed the investment tax credit for the motor controls and tap-in lines by which the factory machinery was directly connected to the electrical system, and it allowed the tax credit for a small portion of the cost of the office electrical system. It took the position that under Treasury Regulation Section 1.48–1(e)(2) "electrical wiring" is a building component and that the switchboards, conduits, ducts and transformers were simply a part of the wiring of the electrical system. This court ruled, however, that since the electrical system was predominantly used for the operation of the machinery; that it was specifically designed to service machinery at particular points in the factory; and that any subsequent user of the plaintiff's factory for any purpose other than processing tobacco would in all probability have to relocate the system in order to accommodate any other type of machinery, that percentage of the use of the system allocable to the factory machinery agreed to by the parties should be entitled to the investment tax credit, citing *Scott Paper Company v. Commissioner,* 74 T.C. 137 (1980).

In holding this "function" test to be improper the Fourth Circuit said:

We believe that the proper approach is ... to determine whether the system has more general uses than simply operating specific items of machinery. Thus, if the wiring and other components of the elec-

---

1. For a more detailed description of the factory electrical distribution system see plaintiff's proposed findings of fact which the court adopts as its own as follows: 6, 7, 10, 11 (except for its last sentence), 12 (except for its last sentence), 13, 14 (except for its last sentence), 15 (except for its last sentence), 16 and 17.

trical system could be adapted to other operations, they are structural components of the building. For example, wiring providing electricity for lighting is certainly a structural component, because lighting is a general need of many manufacturing operations. Similarly, an electrical system providing power to machinery is a structural component if the system can feasibly be adapted to uses other than the specific machine it was designed to serve.

One method of analyzing the issue would be to determine whether a manufacturer converting the building to an alternate process would be able, with reasonable alterations, to use the existing system, or whether he would have essentially to scrap the system and install another. Of course, to be considered a structural component the electrical system need not be adaptable to all conceivable uses, but only flexible enough that it is not inextricably linked to the present, specific machinery.

Monk's electrical systems were designed to meet its own operational needs, and the government, in an effort to show it is a permanent installation, emphasizes that the systems cannot be removed and used elsewhere. The relevant inquiry, however, is whether they can be reasonably adapted in the present building to more general uses. If so, they are structural components of the building.

At the second trial the court took additional evidence on the relationship between the electrical systems, the machinery and the factory building and office, and each side presented detailed explanations of the precise use for each component of the electrical systems. Plaintiff's witnesses testified to the effect that the electrical systems are inextricably intertwined with its manufacturing and business operations and therefore are not adaptable to other general uses. Defendant's witnesses, on the contrary, testified that the buildings together with their electrical systems can be used for many alternate purposes. Under the guidelines now available to the court the factual inquiry remaining for resolution is whether plaintiff's electrical systems can feasibly be adapted to uses other than the operation of the machinery and appliances for which plaintiff is presently using them.

The burden of proof on this issue is on the plaintiff, and a careful review of the evidence has led the court to conclude that the plaintiff has failed to carry its burden. While the court has no difficulty in finding that it is highly unlikely that the plaintiff's factory building will ever be used by the plaintiff or anyone else for any purpose other than processing tobacco, and the court is likewise confident that if the plaintiff should ever abandon this factory the experience it had with two previous factories which it abandoned would be repeated and neither the building nor its electrical system would have any appreciable salvage value. As the court understands the Fourth Circuit's decision, however, it is permitted if not indeed required to consider whether a hypothetical user could adapt and use the electrical distribution systems for other purposes. This is where the plaintiff's proof has failed it.

As is evident from the plaintiff's proposed findings of fact previously adopted by the court, the component parts of the electrical systems are stock items which can be purchased at any electrical equipment supplier. Naturally the various transformers, switchboards and conduits were located throughout the buildings in positions which enabled them to serve the particular machinery and appliances in their locations, and doubtless a new occupant of the building would in all probability have to make substantial rearrangements of this equipment in order to serve other machinery and appliances efficiently. But the evidence for the plaintiff fell short of establishing that such rearrangement would not be feasible.

Defendant's evidence, on the other hand, identified several alternative uses for plaintiff's facility such as a distribution center for a department store chain, bulk storage for consumer and industrial products, fertilizer and feed bagging, the manufacture

of auto parts and major appliances and the processing of products such as cotton textiles. Defendant's witnesses testified that the electrical systems could be modified to service machinery needed to carry on such businesses.

The conclusion is that plaintiff's electrical systems are not extraordinary or unique; that their components are standardized; and that although specifically designed and installed to serve the plaintiff's needs, the systems are not unlike the electrical distribution systems used in any other factory which requires a heavy power demand. A new user of the factory could make use of most of its existing electrical system by installing its own motor control centers and wiring them to the system. Indeed, as the plaintiff itself has acquired additional machinery and equipment it has put it into service by simply tapping in to the existing system without adding distribution panels, bus ducts, transformers or switch panels. This being so, the electrical systems must be held not to qualify as "tangible personal property" under Section 48(a)(1)(A)(i) or as "other tangible personal property" under Section 48(a)(1)(B)(i) and therefore not entitled to the investment tax credit.

An appropriate order will be entered.