T.C. Memo. 1999-236


UNITED STATES TAX COURT


GARY G. AND LINDA J. HART, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5492-98.                    Filed July 21, 1999.


<u>Gary R. Matthews</u>, for petitioners.

<u>Aubrey C. Brown</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.[1]

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable year in
(continued...)

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1994 in the amount of $3,109.

After concessions by the parties,[2] the issues for decision are as follows:

(1)  Whether petitioners' tobacco barn is section 179 property; and,

(2)  What is the applicable recovery period for petitioners' tobacco barn.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Richmond, Kentucky, at the time that their petition was filed with the Court.

Petitioners own a 187-acre farm on which they grow burley tobacco and raise beef cattle.  In addition, petitioners grow a

_____

(...continued)
issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]  Petitioners concede an adjustment regarding the applicable depreciation method, recovery period, and convention with respect to a concrete septic tank.  Further, petitioners concede an adjustment for Schedule F mortgage interest in the amount of $3,217.  Respondent concedes that petitioners are entitled to Schedule A deductions for State and local taxes in the amount of $1,026, home mortgage interest in the amount of $3,217, medical expenses in the amount of $2,243 to the extent such amount exceeds 7.5 percent of adjusted gross income, and charitable contributions in the amount of $3,123.  Finally, the parties agree that the earned income credit adjustment is purely computational.

limited amount of corn and hay to feed their cattle. During the year in issue, petitioners grew approximately 50,000 pounds of tobacco on their farm. Petitioners also purchase, and make ready for market, tobacco crop from tobacco farmers who do not themselves process the tobacco.

To make their tobacco ready for market, petitioners process the tobacco in the following manner: Petitioners generally harvest their tobacco crop at the end of July. The cut tobacco is then mounted over approximately 4-foot-long sticks, six to eight plants on a single stick. The tobacco is then left in the field for a few days for field curing; i.e., drying. Thereafter, the tobacco is loaded onto wagons and transported to a tobacco barn. In the tobacco barn, the tobacco sticks are hung on stringers and left to cure for several months, generally until October. Petitioners hire a "few" employees for about 6 weeks to assist them with the aforementioned tasks.

After curing their tobacco, petitioners strip the tobacco leaves from the stalk and grade them into 3 to 4 different qualities. Stripping and grading of the tobacco leaves are essential parts of petitioners' tobacco business. Finally, petitioners bale the graded tobacco leaves, put them into boxes, and transport them to another location where they are eventually shipped to the market. Petitioners hire a "few" employees, generally for about 5 months, to assist them with the stripping, grading, baling, and boxing of the tobacco leaves.

Petitioners acquired a new tobacco barn in 1994 (the Tobacco Barn). The Tobacco Barn is an enclosed structure consisting of wooden walls, a high A-type ceiling, and a dirt floor. It is 36 feet wide and 96 feet long. It has 3 doors on each of two opposite sides large enough to admit large pieces of machinery or farming equipment. The Tobacco Barn is constructed with 42 support beams, four across and thirteen deep, set on concrete piers. There are drop rails running north to south and east to west at a 90-degree angle to the support beams. The drop rails are set at three different heights and are used to hang the tobacco sticks. The Tobacco Barn is not foundationally strong and could not, for example, house cattle. However, the Tobacco Barn could be structurally strengthened with relative ease.

The Tobacco Barn was constructed to provide for ventilation through the roof, side walls and side doors. On each of the two opposite sides of the barn, there are approximately seven ventilator doors (about 2 feet wide) used to control air flow. There are also cracks between the boards on the sides of the barn. Due to the cracks in the walls, large quantities of grain cannot be stored in the Tobacco Barn.

The Tobacco Barn is equipped with minimal electrical wiring and lighting fixtures. It is not insulated, nor does it have heating or plumbing.

The Tobacco Barn was not completed until November 1994, and petitioners did not cure tobacco in the Tobacco Barn during 1994. After its completion, petitioners used the Tobacco Barn for stripping, grading, and baling the tobacco leaves.

Since 1994, petitioners have used the Tobacco Barn in a substantial part of their tobacco business, including the curing, stripping, grading, baling, and boxing of the tobacco leaves. During curing season, petitioners use the Tobacco Barn mainly as a curing facility. During that season, all of the work performed in the Tobacco Barn is related to the curing of the tobacco. For example, the Tobacco Barn is not equipped with a cable hoist system, and tobacco is hung manually by petitioners and their employees.

After the curing season, petitioners use the Tobacco Barn for about 5 months of the year for stripping, grading, and baling, and boxing of the tobacco leaves in what is commonly referred to as a stripping room. A good stripping room is essential to tobacco producers for preparation of the tobacco for market. A stripping room need not be located inside a tobacco barn. In fact, it is preferable to haul the unstripped tobacco to a more suitable location. However, smaller producers suffice by temporarily enclosing a portion of their barn with plastic and using a foldup bench and portable heat. Petitioners chose this latter option.

The stripping room (or more appropriately in petitioners' case, the "stripping area") is located in the center of the Tobacco Barn.  It is 12 feet wide and 24 feet long.  It consists of plywood stacked to form a work bench, a small machine used to strip tobacco, and a hydraulic press used to bale tobacco.  The stripping area is not always enclosed.  Only in cold weather do petitioners enclose the stripping area, using plastic sheeting and plywood to provide shelter.  It takes about a day to enclose the stripping area.

The Tobacco Barn is generally not used in petitioners' tobacco business between March and July.  However, in some years, a limited amount of tobacco may remain hanging in the Tobacco Barn beyond February --for example when petitioners produce tobacco in excess of their sales quota.  Petitioners occasionally use the Tobacco Barn to store farm equipment.

Petitioners own two other barns.  These other barns are referred to by petitioners as "combination barns".  Combination barns are of a sturdier design than the Tobacco Barn and may be used to cure and process tobacco, as well as house cattle or store grain.

On their 1994 Federal income tax return, petitioners reported the cost of the Tobacco Barn as $16,730 and elected to deduct $6,754 of that amount under section 179.  Petitioners claimed depreciation for the balance of the cost of the Tobacco

Barn using the midquarter convention, the 150-percent declining balance method, and a 10-year recovery period.  In the notice of deficiency, respondent determined that the $16,730 cost consisted of the cost of two separate assets: (1) The Tobacco Barn, and (2) a concrete septic tank.[3]  Respondent determined that the Tobacco Barn was not entitled to section 179 treatment and that the applicable recovery for the Tobacco Barn is 20 years.

OPINION

Issue 1.  Deduction Under Section 179

Section 179(a) allows a taxpayer to deduct, rather than capitalize, the cost of certain property up to specified dollar limits as specified in section 179(b).  The deduction is allowable for the entire cost or a portion of the cost of the property.  See sec. 1.179-1(b), Income Tax Regs.  As pertinent here, section 179 property is any tangible property that is section 1245 property as defined in section 1245(a)(3).  See sec. 179(d)(1).  Section 1245 property is defined, by section 1245(a)(3) as, inter alia:

> (A) personal property,
>
> (B) other property (not including a building or its structural components) but only if such other property is tangible and * * *

_____

[3]  As previously mentioned, petitioners have conceded the adjustment regarding the concrete septic tank.

(i) was used as an integral part of manufacturing, production, or extraction * * * , or

* * * * * * *

(iii) constituted a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities * * * [or]

* * * * * * *

(D) a single purpose agricultural or horticultural structure (as defined in section 168(i)(13)),

Section 1.1245-3(c)(2), Income Tax Regs., provides that language used to describe property in section 1245(a)(3)(B) shall have the same meaning as when used in paragraph (a) of section 1.48-1, Income Tax Regs., and the terms "building" and "structural components" shall have the meanings assigned to those terms in paragraph (e) of section 1.48-1, Income Tax Regs.

In Hospital Corp. of Am. v. Commissioner, 109 T.C. 21, 50-51 (1997), we held that in deciding whether a property is section 1245 property, Congress intended the same tests to be used as were applied for purposes of deciding whether property was "section 38 property" for purposes of the investment tax credit under section 48 prior to the amendment of section 48 in the Omnibus Budget Reconciliation Act of 1990 (OBRA), Pub. L. 101-

508, sec. 11813(a), 104 Stat. 1388-536, 1388-541 (effective with respect to property placed in service after December 31, 1990).[4]

_____

[4] Henceforth, all references to sec. 48 are to that section previous to its amendment by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11813(a), 104 Stat. 1388-536, 1388-541.

Prior to its amendment, sec. 48(a)(1) provided as follows:

(1) In General.--* * * the term "section 38 property" means--

(A) tangible personal property * * *, or

(B) other tangible property (not including a building and its structural components) but only if such property--

(i) is used as an integral part of manufacturing, production, or extraction * * *, or

*   *   *   *   *   *   *

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities * * *, or

*   *   *   *   *   *   *

(D) single purpose agricultural or horticultural structures; * * *

Sec. 48(p)(3), defined the term "single purpose horticultural structure" as follows:

(A) a greenhouse specifically designed, constructed, and used for the commercial production of plants, and

(B) a structure specifically designed, constructed and used for the commercial production of mushrooms.

(continued...)

Petitioners contend that the Tobacco Barn qualifies as section 1245 property as the term in defined under both section 1245(a)(3)(B) and section 1245(a)(3)(D).

A.  Section 1245(a)(3)(B)

Petitioners' first contention is that the Tobacco Barn is a structure, other than a building, used as an integral part of manufacturing or production of tobacco, and meets the requirements of section 1245(a)(3)(B)(i).  Alternatively, petitioners contend that the Tobacco Barn is a structure, other than a building, used as a facility in connection with the manufacturing or production of tobacco for the bulk storage of tobacco and meets the requirements of section 1245(a)(3)(B)(iii). Respondent argues that the Tobacco Barn is a "building" within

---

[4](...continued)
Further, sec. 48(p)(4) provided:

   (4) Structures Which Include Work Space.--An enclosure or structure which provides work space shall be treated as a single purpose * * * horticultural structure only if such work space is solely for--

        (A) the stocking, caring for, or collecting of * * * plants * * * or their produce,

        (B) the maintenance of the enclosure or structure, and

        (C) the maintenance or replacement of the equipment or stock enclosed or housed therein.

the meaning of the exclusion of section 1245(a)(3)(B).[5]  We agree
with respondent.

The term "building" as used in section 48, and therefore as
applicable to our discussion, "has caused much consternation
among taxpayers and has produced a correspondingly large amount
of litigation."  See Scott Paper Co. v. Commissioner, 74 T.C.
137, 177 (1980).  As a result, the term "building" has become a
term of art.  See id.  In this regard, it has long been
established that used in the context of section 48, Congress
intended that the term "building" be given its "commonly accepted
meaning, that is, a structure or edifice enclosing a space within
its walls, and usually covered by a roof."  H. Rept. 1447, 87th
Cong., 2d Sess. (1962), 1962-3 C.B. 405, 516; S. Rept. 1881, 87th
Cong., 2d Sess. (1962), 1962-3 C.B. 707, 858-859; see, e.g.,
Yellow Freight Sys., Inc. v. United States, 538 F.2d 790, 795-796
(8th Cir. 1976); Munford, Inc. v. Commissioner, 87 T.C. 463
(1986), affd. 849 F.2d 1398 (11th Cir. 1988); Samis v.
Commissioner, 76 T.C. 609, 617 (1981); Valmont Indus., Inc. v.
Commissioner, 73 T.C. 1059, 1072 (1980); Satrum v. Commissioner,
62 T.C. 413, 416 (1974).

---

[5]  In the alternative, respondent argues that the Tobacco
Barn does not meet a number of the other requirements of sec.
1245(a)(3)(B)(i), (iii).  However, because we agree with
respondent that the Tobacco Barn is a "building", we need not
consider these alternative arguments.

Section 1.48-1(e)(1), Income Tax Regs., defines the term "building" as follows:

> The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space.  The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores.  * * *  The term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke-ovens, brick kilns, and coal tipples.

This regulation has been interpreted to establish a two-part test that considers both "appearance" and "function" in determining whether a particular structure is a "building".

The appearance test, as its name implies, considers whether the structure has the appearance of a building in the ordinary sense.  See Yellow Freight Sys., Inc. v. United States, supra at 797-798; cf. A.C. Monk & Co. v. United States, 686 F.2d 1058 (4th Cir. 1982).  The testimony and photographs in the record clearly show that the Tobacco Barn resembles a building in appearance. Thus, the Tobacco Barn would be considered a building under the appearance test of section 1.48-1(e)(1), Income Tax Regs.

The scope of the term "building" is limited to structures used for purposes or functions similar to those enumerated in section 1.48-1(e)(1), Income Tax Regs.  See Munford, Inc. v. Commissioner, supra at 479; Catron v. Commissioner, 50 T.C. 306,

311 (1968).  Thus the functional test is described as one that inquires (1) Whether the purpose of the structure at issue is a purpose "ejusdem generis" to the purposes described by example in section 1.48-1(e)(1), Income Tax Regs., and (2) whether the structure performs a function similar to those structures enumerated in section 1.48-1(e)(1), Income Tax Regs., as buildings; i.e., apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. See Consolidated Freightways, Inc. v. Commissioner, 74 T.C. 768, 795 (1980), affd. in part and revd. in part on another issue 708 F.2d 1385 (9th Cir. 1983).

Thus, the Court must consider whether the structure functions like a building; i.e., does it "'provide shelter * * * or furnish working * * * space, or exist for another purpose that could be listed with the enumerated purposes without violating the constraining rules of ejusdem generis.'"  See Consolidated Freightways, Inc. v. Commissioner, 708 F.2d 1385, 1388 (9th Cir. 1983), affg. in part and revg. in part on another issue 74 T.C. 768 (1980).

In applying the functional test, one of the major focuses of inquiry is whether the structure provides working space for employees that is more than merely incidental to the primary function of the structure.  See, e.g., Brown-Forman Distillers Corp. v. United States, 205 Ct. Cl. 402, 418, 499 F.2d 1263, 1271

(1974); <u>Munford Inc. v. Commissioner</u>, <u>supra</u> at 480; <u>Scott Paper Co. v. Commissioner</u>, <u>supra</u> at 178; <u>Valmont Indus., Inc. v. Commissioner</u>, <u>supra</u> at 1072; <u>Catron v. Commissioner</u>, <u>supra</u> at 316; <u>Brown & Williamson Tobacco Corp. v. United States</u>, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974). In this regard, it is appropriate to consider both the quantity and quality of the human activity within the structure. See <u>Consolidated Freightways, Inc. v. United States</u>, 223 Ct. Cl. 443, 461, 620 F.2d 862, 873 (1980); <u>Munford, Inc. v. Commissioner</u>, <u>supra</u> at 480; <u>Consolidated Freightways, Inc. v. Commissioner</u>, 74 T.C. at 795; <u>Satrum v. Commissioner</u>, <u>supra</u> at 417. If the nature of work performed within the structure is merely supportive and ancillary to the function of the structure, then the structure is not considered as providing "working space." See <u>Valmont Indus., Inc. v. Commissioner</u>, <u>supra</u> at 1074.

In <u>Valmont Indus., Inc. v. Commissioner</u>, <u>supra</u> at 1073, we considered whether a structure provided "working space". Considering the quantity and the nature of the employee activity performed in two galvanizing facilities, we stated:

> the proper inquiry is whether "a substantial number of employees were frequently and regularly occupied" in the facility. This determination will necessarily depend upon the nature of the business venture housed within that structure. [Citation omitted.]

We went on to hold that in the context of that taxpayer's galvanizing operation, work performed by 10 to 16 employees

within the structure on a regular basis was substantial in quantity and nature.

Therefore, the galvanizing structure was held to be a "building". Petitioners contend that the Tobacco Barn was designed and constructed as a curing facility. They assert that as a curing facility, the Tobacco Barn is not similar to those structures enumerated in section 1.48-1(e)(1), Income Tax Regs., as "buildings".

There is no dispute that petitioners and their employees performed many chores in the Tobacco Barn. The type of chores performed in the Tobacco Barn was twofold. First, petitioners and their employees spent about 6 weeks transporting tobacco from the field to the Tobacco Barn and hanging the tobacco sticks therein. We are satisfied that this activity would not lead to the conclusion that the Tobacco Barn provided "working space".

However, the Tobacco Barn provided "working space" beyond that ancillary to the function of the structure as a curing facility. For about 5 months of the year, petitioners and certain employees used the Tobacco Barn on a full-time basis to prepare the tobacco for sale by stripping, grading, baling, and boxing the tobacco. Given the nature of petitioners' tobacco manufacturing business, human activity in stripping, grading, baling, and boxing the tobacco was regular and frequent, and exceeded the amount of human activity required in the curing

process.  Thus, the Tobacco Barn provided working space that was more than merely incidental to the function of the structure as a curing facility.

Petitioners rely heavily on <u>Brown & Williamson Tobacco Corp. v. United States</u>, <u>supra</u>.  Petitioners' reliance on this case is misplaced.  In <u>Brown & Williamson Tobacco Corp. v. United States</u>, 369 F. Supp. at 1287, the District Court specifically relied on the fact that the tobacco shed did not provide "working space" other than "bringing in and out of the tobacco hogsheads and their placement in the racks created for them and their removal therefrom" to hold that the tobacco shed in issue did not constitute a "building".  The District Court indicated that the work involved in lifting tobacco hogsheads to storage racks was ancillary to the function of the structure as a storage facility.  Obviously, petitioners' case is distinguishable from <u>Brown & Williamson Tobacco Corp. v. United States</u>, <u>supra</u>, in that the Tobacco Barn provided frequent and regular "work space" in the context of petitioners' tobacco manufacturing business.

In a number of cases, this Court has considered a discrete area of a larger structure to be "a structure other than a building", while holding other discrete areas of the same structure to be a "building".  See, e.g., <u>Munford Inc. v. Commission er</u>, 87 T.C. at 481 (each of three distinct areas, a truck loading platform, a rail-loading platform and a

refrigerated area were considered separately under the functional test); <u>Central Citrus Co. v. Commissioner</u>, 58 T.C. 365 (1972) (sweet rooms of permanent construction that were closed off from the remainder of the plant by a floor-to-ceiling wall were considered separately); <u>Catron v. Commissioner</u>, 50 T.C. 306 (1968) (cold-storage room sealed off from rest of structure by a floor-to-ceiling wall was considered separately).

Petitioners' case, however, is factually distinguishable from the above-mentioned cases because the stripping area in the Tobacco Barn is not a distinct, nor permanent, structure. During good weather, the area is not partitioned by any material. In cold weather, petitioners put up a temporary "room" by hanging plastic sheeting and plywood to wood beams providing structural support for the Tobacco Barn. Under these circumstance, the stripping area cannot be considered distinct from the rest of the Tobacco Barn, and the work performed in that area must be considered work performed in the Tobacco Barn.

Based on the foregoing, the Tobacco Barn is a "building" and therefore is not section 1245 property within the meaning of section 1245(a)(3)(B).

B. <u>Section 1245(a)(3)(D)</u>

Alternatively, petitioners contend that the Tobacco Barn is a single purpose horticultural structure as defined in section

1245(a)(3)(D).  Respondent contends that the Tobacco Barn is a

general purpose structure.  We agree with respondent.

Section 168(i)(13)(B)(ii) defines a "single purpose

horticultural structure" as:

> (I) a greenhouse specifically designed,
> constructed, and used for the commercial production of
> plants, and

> (II) a structure specifically designed,
> constructed, and used for the commercial production of
> mushrooms.

In addition, section 168(i)(13)(B)(iii) provides:

> An enclosure or structure which provides work space
> shall be treated as a single purpose * * *
> horticultural structure only if such work space is
> solely for--

>> (I) the stocking, caring for, or
>> collecting of livestock or plants (as the
>> case may be) or their produce,

>> (II) the maintenance of the enclosure or
>> structure, and

>> (III) the maintenance or replacement of
>> the equipment or stock enclosed or housed
>> therein.

Thus, in essence, section 168(i)(13)(B) requires that in

order to be a "horticultural structure", an asset must meet three

tests.

First, the structure must be specifically designed and

constructed for permissible purposes (i.e., the "specific design

test").  See sec. 1.48-10(c)(1)(i), Income Tax Regs.  The only

permissible purposes for a single purpose horticultural structure

are "The commercial production of plants (including plant products such as flowers, vegetables, or fruit) in a greenhouse" or "the commercial production of mushrooms." Sec. 1.48-10(c)(2), Income Tax Regs. (Emphasis added). It is clear that the Tobacco Barn was not specifically designed and constructed for either of these permissible purposes. The Tobacco Barn is not a greenhouse in which plants or plant products such as flowers, vegetables or fruits are commercially produced. See sec. 1.48-10(c)(2)(i), Income Tax Regs. Neither is it a structure used in the commercial production of mushrooms. See sec. 1.48-10(c)(2)(ii), Income Tax Regs. The Tobacco Barn therefore does not meet the specific design test.[6]

Second, a "horticultural structure" must be exclusively used for (i.e., the "exclusive use test") the above-enumerated purposes. See sec. 1.48-10(c)(1)(ii), Income Tax Regs. Under

---

[6] Although not dispositive, we find petitioners' characterization of the Tobacco Barn as a "barn" to be probative in evaluating the function of the structure. Legislative history and case law indicate that "general purpose agricultural structures such as barns and other farm structures which can be adapted to a variety of uses" do not constitute single purpose horticultural structures. S. Rept. 95-1263 at 117 (1978), 1978-3 C.B. (Vol. 1) 315, 415; see Sherwood v. Commissioner, T.C. Memo. 1988-544. Petitioners stored farm equipment in the Tobacco Barn. Although not clear at what financial cost, the Tobacco Barn could also be made foundationally stronger and could thereafter house cattle. Thus, even though we do not base our holding on this issue, these facts suggest that the Tobacco Barn could be adapted to a variety of uses and therefore is a "general purpose" structure.

the exclusive use test, using the structure to process or market the product is "nonpermissible". See Oregon Trail Mushroom Co. v. Commissioner, T.C. Memo. 1992-293; sec. 1.48-10(e)(1)(i)(A), Income Tax Regs. Section 1.48-10(e)(1)(iv), Income Tax Regs, provides that "a horticultural structure that contains an area for processing plants or plant products will fail the exclusive use test because there is a nonpermissible use."

To decide whether the Tobacco Barn meets the exclusive use test, we must therefore consider whether the curing, stripping, grading, baling and boxing of the tobacco leaves constitute "production" activities or whether any is a "nonpermissible" use of that structure.

In Oregon Trail Mushroom Co. v. Commissioner, T.C. Memo. supra, the issue was whether certain structures were used for the commercial production of mushrooms. In that case, we held that a structure used in the "production" of mushrooms is not merely a structure where mushrooms actually grow. Rather, we held that a structure used to pasteurize compost, i.e., "to kill all organisms so that only mushrooms will grow", constituted a structure used in the production of mushrooms. We held that the pasteurization step was a necessary step and to eliminate that step would reduce or destroy the mushroom crop. See id. Although in Oregon Trail Mushroom Co. v. Commissioner, supra, we gave broad interpretation to the term "production facility", we

cannot define that term as broadly in the context of petitioner's Tobacco Barn.  The distinction lies in the fact that the Tobacco Barn was not used in the production of mushrooms.  Congress chose that in the context of <u>mushroom</u> production, a single purpose horticultural structure would be any "structure" specifically designed and constructed for that purpose, whereas in the context of <u>plant</u> production, a single purpose horticultural structure would be any "greenhouse" specifically designed and constructed for that purpose.  See sec. 168(i)(13)(B)(ii).  By using the word "greenhouse", we think that Congress intended that only "plant" production activities of the type performed in a "greenhouse" would qualify as plant production activities.  Thus, petitioners' Tobacco Barn, a structure other than a greenhouse, used in the curing, stripping, grading, baling, and boxing of tobacco-- activities which we think constitute market preparation--does not meet the "exclusive use" test.

In addition, the Tobacco Barn was extensively used in making the tobacco ready for market.  As mentioned, work space in a single purpose horticultural structure must be limited to that necessary to stock, care for, or collect plants or their products.  See sec. 168(i)(13)(B)(iii).  As provided by section 1.48-10(f)(2), Income Tax Regs., the term "stocking, caring for, or collecting" plants includes ancillary postproduction activities.

However, the curing, stripping, grading, baling, and boxing of the tobacco leaves are not "ancillary post-production activities". See sec. 1.48-10(f)(2), Income Tax Regs. Although "gathering, sorting, loading," and "packing" activities when "carried on in conjunction with" and "ancillary" to other permissible purposes, do not disqualify a structure as a "single purpose agricultural structure", they cannot constitute the sum total of the activities performed in the structure. Id. Because we are not persuaded that any of the activities performed in the Tobacco Barn, i.e., the curing, stripping, grading, baling, and boxing of the tobacco leaves, constitute the commercial production of plants in a greenhouse, we cannot hold that such activities simply constitute "ancillary post production" activities. See id.

Third, for a structure to be a "single purpose horticultural" structure, it must satisfy an "actual use" test. See sec. 1.48-10(e)(2), Income Tax Regs. However, because we have held that the Tobacco Barn does not meet the "specific design" or the "exclusive use" test, we need not consider whether it meets the "actual use" test.

Based on the foregoing, we hold that the Tobacco Barn is not a single purpose horticultural structure. It therefore follows that the Tobacco Barn is not section 179 property.

Issue 2.  Recovery Period

We must decide the applicable recovery period for the Tobacco Barn.  Respondent determined that the Tobacco Barn is 20-year property.  Petitioners contend that the Tobacco Barn is 10-year or in the alternative 15-year property.  We agree with respondent.

The applicable recovery period is an element in the calculation of the deduction for depreciation allowed by section 167.  As pertinent here, section 168(c) provides the following applicable recovery periods:

| Type of property | Applicable recovery period |
| --- | --- |
| 10-year property | 10 years |
| 15-year property | 15 years |
| 20-year property | 20 years |

Section 168(e)(1) generally defines 10-year property as property having a class life of 16 years or more, but less than 20 years, 15-year property as property having a class life of 20 years or more, but less than 25 years, and 20-year property as property having a class life of 25 or more years.  "Class life", as defined by section 168(i)(1), is determined by reference to former section 167(m), as in effect prior to its repeal by the OBRA sec. 11812(a), 104 Stat. 1388-534.  Section 167(m) provided for a depreciation allowance based upon the class life prescribed by the Secretary of the Treasury or his delegate.

The class lives of depreciable assets can be found in a series of revenue procedures issued by the Commissioner.  See sec. 1.167(a)-11(b)(4)(ii), Income Tax Regs.  The revenue procedure in effect for the years in issue in this case is Rev. Proc. 87-56, 1987-2 C.B. 674.  As pertinent here, Rev. Proc. 87-56, 1987-2 C.B. 677, provides the following asset guideline classes:

00.3 Land Improvements:

> Includes improvements directly to or added to land, whether such improvements are section 1245 property or section 1250 property, provided such improvements are depreciable.  Examples of such assets might include sidewalks, roads, canals, waterways, drainage facilities, sewers, * * * wharves and docks, bridges, fences, landscaping, shrubbery, or radio and television transmitting towers.  Does not include land improvements that are explicitly included in any other class, and buildings and structural components as defined in section 1.48-1(e) of the regulations. * * *

    *    *    *    *    *    *    *

01.3 Farm buildings except structures included in Class 01.4

01.4 Single purpose agricultural or horticultural structures (within the meaning of section 48(p) of the Code).

Assets includable in class 00.3 have a class life of 20 years and, by virtue of section 168(e)(1) are 15-year property, with an applicable recovery period of 15 years.  See sec. 168(c)(1).  Assets includable in class 01.3 have a class life of 25 years and, by virtue of section 168(e)(1) are 20-year property, with an applicable recovery period of 20 years.  See

id.  Finally, single purpose agricultural or horticultural structures are, by virtue of section 168(e)(3)(D)(i), 10-year property, with an applicable recovery period of 10 years.  See id.

Respondent contends that the Tobacco Barn is a "farm building", a class 01.3 asset, and therefore has a recovery life of 20 years.  Petitioners contend that the Tobacco Barn has a recovery period of 10 years because it is a single purpose horticultural structure.  As discussed above, the Tobacco Barn is not a single purpose horticultural structure and therefore does not have a 10-year recovery period as prescribed under section 168(e)(3)(D)(i).

In the alternative, petitioners contend that the Tobacco Barn is a "land improvement", a class 00.3 asset, and therefore has a recovery period of 15 years.  As discussed above, the Tobacco Barn is a building as defined under section 1.48-1(e), Income Tax Regs.  Class 00.3 specifically excludes "buildings".  Therefore, the Tobacco Barn does not have a 15-year recovery period by virtue of being includable in class 00.3.  Petitioners have not asserted that the Tobacco Barn is 10-year or 15-year property by virtue of being includable in any other class of assets.  We therefore sustain respondent on this issue.

To reflect our disposition of the disputed issues, as well as the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.